OMA E. WALKER, Respondent, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant, No. 42138—243 S. W. (2d) 92.

Division One, September 10, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, November 12, 1951.

*Coburn, Storckman & Croft, Thomas L. Croft* and *Rexford H. Caruthers* for appellant.

650

*Harold O. Piening, E. D. Franey* and *Hay & Flanagan* for respondent.

651

652

██ COIL, C.—This is an appeal from a judgment for $14,000 entered upon a verdict awarding damages to respondent for personal injuries. Appellant alleges error in the giving of each of two instructions, in the allegedly improper use of a deposition on cross-examination, and contends that the verdict is excessive. We have concluded, for the reasons hereinstated, that the judgment should be affirmed conditioned upon the entry of a remittitur. We shall refer to the parties as plaintiff and defendant.

On January 3, 1949, plaintiff was a front seat passenger in an automobile driven by her husband, proceeding northeastwardly in the middle northeastbound traffic lane on the south half of Gravois Avenue in St. Louis. Jefferson Avenue, a north and south street, intersects Gravois. There are electric traffic signals at the corners of the intersection. There are double streetcar tracks in the center of Jefferson for north and southbound cars, respectively. When the automobile reached the west curb line of Jefferson, plaintiff and her driver-husband for the first time saw defendant's streetcar at the north curb of Gravois proceeding against the red stop and go light south on Jefferson at a speed of 25-40 m.p.h. Plaintiff's husband immediately applied his brakes and brought the automobile to a stop with the right front portion thereof six inches west of the west rail of the southbound track. Immediately, the right front corner of the streetcar struck the right front of the automobile, resulting in injury to plaintiff.

Plaintiff went to the jury on primary negligence and under the humanitarian doctrine. Humanitarian Instruction No. 2 submitted failure to warn, slacken speed, or stop, in the disjunctive. Defendant contends that there was insufficient evidence adduced to support the submission of failure to warn and failure to stop. Defendant's attack on Instruction No. 2 depends upon the validity of the premise that the instruction by its language limited the zone of peril to the area within the prolongation of the curb lines of Jefferson and Gravois. Defendant does not contend that there was not sufficient evidence to properly submit the case on failure to warn and failure to stop if the zone of peril was not so limited.

██ Instruction No. 2 required the jury to find that plaintiff was a passenger in an automobile proceeding northeastwardly on Gravois "*at its intersection with Jefferson Avenue*"; that defendant streetcar was ██ proceeding southwardly on Jefferson "*at said intersection*"; and that "*at said time and place were in a position of imminent peril of being collided with by said streetcar,*" etc. Defendant urges that, by the use of the foregoing italicized phrases, plaintiff limited the zone of peril to the area encompassed by the prolongation of the curb

lines of Jefferson and Gravois. Defendant argues, and cites applicable authorities in support of the proposition, that "intersection" means the encompassed area indicated, at least in instances such as here, in which vehicular traffic is being considered. We shall assume without deciding that "intersection" has the meaning ascribed to it by defendant. The difficulty with defendant's position is that it fails to give any meaning to the other words contained in the phrases in question. As we view it, the key word in each of the phrases, *at its intersection*, and *at said intersection*, is the word *at*. Certainly this word has some meaning in the context in which used. The word *at* is said to be an indefinite word, less definite than *in* or *on*, and to often mean *near*. The primary meaning accorded the word *at* by the dictionary is: "Primarily, *at* expresses the relation of *presence or contact in space or time*, or of *direction toward*. It has much the sense of *to* without its implication of motion, and is less definite than *in*, *on*, *by*, etc. Thus, *at* the house, may be *in* or *near* the house." Webster's New International Dictionary, Second Edition. See also, 7 C. J. S. pp. 152-166; Words and Phrases, Perm. Ed., Vol. IV, pp. 648-652.

In Counts v. Medley, 163 Mo. App. 546, 146 S. W. 465, it was held that the significance of the word *at* is generally controlled by the context and the surrounding circumstances, and that an agreement not to engage in the produce business *at* the town of Rogersville for five years included an agreement not to engage in the produce business in the town of Henderson, located about 1-½ miles north of Rogersville. For other cases construing the word *at* to mean *near* when used in various contexts and under various circumstances, see Goninon v. Lee (S. C. Wash.), 206 P. 2; Clark County Fiscal Court, et al. v. Powell Co. Fiscal Court (Ct. App. Ky.), 2 S. W. (2d) 1039, 1041; Wyble v. Lafleur (Ct. App. La. 1st Cir.) 164 So. 461; Fayette Co. Board of Education v. Tompkins (Ct. App. Ky.), 280 S. W. 114, 116; Birmingham Ry. Lt. & Power Co. v. McGinty (S. C. Ala.), 48 So. 491, 492.

We think a reasonable construction of the phrases "at its intersection with Jefferson" and "at said intersection," having regard for the context in which used and the circumstances in evidence, does not confine or limit the zone of peril to the area within the prolongation of the curb lines of Jefferson and Gravois; and permits the jury to find that plaintiff was in a position of imminent peril before she reached the prolongation of the west curb line of Jefferson.

█ Plaintiff's Instruction No. 17 is attacked on the ground that it permits the jury to award damages for permanent injuries when there was no substantial evidence of any permanent injury being proximately caused by the accident.

Certain facts appear to be undisputed. Among these are: plaintiff was 36 or 37 years of age and, at the time of the trial and for a great number of years prior to the accident, had rheumatic heart disease

with mitral stenosis; this heart condition was and is permanent and progressive; the accident did not cause the rheumatic heart disease or the mitral stenosis; plaintiff was about four weeks pregnant at the time of the accident and thereafter, in August, 1949, uneventfully delivered a live, healthy baby; plaintiff's heart condition was aggravated by the trauma received in the accident.

The question on this aspect of the case is whether there is substantial evidence from which the jury could reasonably find that the aggravation of plaintiff's pre-existing, long-standing, permanent, and progressive heart condition or disease was a permanent injury. A detailed consideration of certain of the medical evidence is required.

One of plaintiff's doctors explained rheumatic heart disease and mitral stenosis, in the following language: ''Rheumatic heart disease usually consists of any damage to ██ the valves of the heart, so that the valves either fail to close properly, allowing blood to regurgitate, when they should be taking the blood forward; or, the valves may be so narrow, a narrowing, which we term 'stenosis,' which is just like tying a purse string around a piece of tubing and pulling it tight, so that the opening is narrower than normal. It may be the mitral valve, in which case it is known as 'mitral stenosis.' ''

Dr. Flavan, a heart specialist who examined plaintiff for the first time on January 3, 1950 (one year after the accident), and who treated plaintiff thereafter for one month, testified: that on examination, his causative diagnosis was rheumatic heart disease with mitral stenosis, auricular fibrillation, and cardiac enlargement, chiefly of the right ventricle; that he made a functional diagnosis classifying plaintiff in Classes 3 and 4 because she was ''moderately and markedly limited''; that these classes refer to arbitrary classifications used by the American Heart Association which express functional capacity by four groupings: 1. Heart disease with no limitation; 2. With slight to moderate limitation; 3. With moderate to marked limitation; and 4. With marked to ''even failure at bedrest''. Dr. Flavan further testified:

''Q. Taking into consideration, Doctor, the aggravated condition of this lady's heart, will it get better or will it get progressively worse?

''THE COURT: That is, will the aggravated condition get better or worse, if you can distinguish that?

''A. I would like to answer that in this way: that, first of all, rheumatic heart disease of the nature and severity which this patient has, in itself, tends to get worse; and when, to that, is added or should it be added, any aggravating cause, the consummation of the two would naturally—you would expect it to make it worse. It is hard to tell how much this accident has done, hard to express in terms of months or years any necessary change in her expectancy. The rheumatic heart is going to require treatment as long as plaintiff lives and if you assume an aggravation,

you would assume that more close observation and care would be required."

The same doctor further testified that pregnancy and childbirth throw a burden on the heart; that the hospital records show plaintiff gave birth to a baby in each of the years 1935, 1937, and 1948; that at the time of his first examination, plaintiff complained of shortness of breath, had palpitation from exercise, and was aware of the irregularity which was diagnosed as auricular fibrillation; that plaintiff said these things existed before the accident but that shortness of breath, palpitation and a tendency to fatigue were more easily provoked since the accident.

Dr. Stubbs, a heart specialist who treated plaintiff from March 13, 1948, and intermittently to the time of the trial, testified that he made a diagnosis on first examination of mitral stenosis with early left congestive failure and by the time of an examination on February 15, 1950, auricular fibrillation had developed; that plaintiff's injuries (rheumatic heart disease with mitral stenosis and congestive heart failure) are permanent and are apt to shorten her life; that it is unusual for a woman of 37 years to have so severe a condition; that congestive heart failure *does* result from mitral stenosis, but many who have mitral stenosis do not have congestive heart failure; that plaintiff's early heart failure was a result of mitral stenosis but the accident *might* have been the thing that precipitated the congestive heart failure; that where mitral stenosis exists, heart failure *could* and *probably would* result at any time; that any sudden and unexpected occurrence *may* precipitate congestive heart failure; that a Class 2 heart disease means that the patient can lead a normal life with the exception of severe exertion; that the rheumatic heart condition which plaintiff has had at least since 1935 will in itself shorten her life; that plaintiff's pregnancy *possibly* speeded up the development of congestive heart failure but that ordinarily where congestive heart failure occurs from pregnancy alone it does not occur until the sixth or seventh month, while the diagnosis of plaintiff's congestive failure was made in the fourth month of her pregnancy; plaintiff's condition has become progressively worse since the first examination on March 13, 1948, until the time of trial, at which time plaintiff was in "extremely bad shape" and her life expectancy was two years. Dr. Stubbs testified further:

"Q. What has this accident done to her health - - the accident of January 3, 1948?

"A. I feel that it has probably speeded up the course of her development of congestive heart failure. It certainly didn't cause her rheumatic heart disease. Her rheumatic heart disease was caused in her much earlier life."

656

Plaintiff's evidence further showed that prior to the accident she was able to do her housework and her washing and ironing, and since the accident has been unable to do any work.

We are of the opinion that the foregoing testimony, together with the undisputed facts heretofore referred to, relating to plaintiff's condition, constituted substantial evidence from which the jury could reasonably find that, while plaintiff for many years prior to the accident had had rheumatic heart disease with mitral stenosis and that such condition was permanent and progressive, nevertheless, the accident of January 3, 1948, aggravated this pre-existing heart condition and that such aggravation probably hastened the development of congestive heart failure, a permanent condition.

In reaching the conclusion that the evidence is such as to permit the jury to reasonably find that the aggravation hastened the development of congestive heart failure, we are not overlooking the facts: that plaintiff's doctors testified that mitral stenosis *would probably* cause congestive heart failure independent of any aggravation suffered at the time of the accident; that one of plaintiff's doctors testified that the aggravation caused by the accident would last not more than 8 months (although that statement is subject to the interpretation that the doctor was speaking of the duration of the nervous tension resulting from the accident rather than of the total effect of the aggravation upon the heart); that the accident *might* have caused congestive heart failure; that plaintiff's pregnancy *possibly* speeded up the development of congestive heart failure; that any shock *might* cause congestive heart failure; that mitral stenosis probably *would* result in congestive heart failure without the intervention of an accident or other shock.

This is a case in which a jury of laymen could not reasonably find that permanent injury resulted to plaintiff simply because of evidence that her pre-existing heart condition was aggravated by the accident, unless there was expert testimony to the effect that such aggravation caused permanent injury. We think there was an expert opinion sufficiently definite to constitute substantial evidence from which the jury could reasonably find that the accident hastened the development of congestive heart failure. When the entire testimony of Dr. Stubbs is considered, and when his various "might", "may", "could", "would", "possibly", and "probably" statements are analyzed with reference to the manner in which they relate to each other and to his total testimony, we believe that Dr. Stubbs did give his expert opinion that the accident of January 3, 1948, hastened, or caused sooner than would otherwise have been the case, congestive heart failure. The statement of Dr. Stubbs that "I feel that it (the accident) has probably speeded up the course of her development of congestive heart failure" in connection with his whole testimony, amounted to an expert opinion that the aggravation did hasten the

development of congestive heart failure. It will be noted that this statement came after the doctor had testified to the possibilities and probabilities of other causes. Dr. Stubbs conceded that whether the accident of January 3 hastened or speeded up congestive heart failure was necessarily somewhat speculative; he conceded that plaintiff's pregnancy *possibly* speeded up the development of congestive heart failure; he stated that the accident *might* have been the thing that precipitated the congestive heart failure; he conceded that mitral stenosis *could* or *would* have caused it independent of any accident or other shock; but after conceding all this, the doctor then, based upon his examination and upon the facts related to him, was of the opinion that the aggravation caused by the accident in turn brought on congestive heart failure sooner than such condition would have resulted but for the accident. It is true that in making this statement, the doctor used the words "I feel" and "probably." The expression "I feel" and the word "probably" are themselves, in some circumstances, indefinite and would, under certain circumstances, indicate only a scientific possibility rather than an opinion as to causation. Here, however, we are of the view that these words did not prevent the doctor's statement from being reasonably construed as an expression of a definite opinion. Where, as here, it may be determined from the testimony that the doctor was expressing his expert opinion as to the cause of a condition, the form of language used will not deprive the statement of its evidentiary value. Smith v. St. Louis Pub. Serv. Co., (Mo. App.) 235 S. W. (2d) 102, 105 [2-4].

In addition, Dr. Stubbs testified:

"Q. Now, Doctor, can you state with reasonable medical certainty whether that accident would aggravate a previously-existing rheumatic heart of a person?

"A. I believe it would.

"Q. It would. To what extent, Doctor?

"A. To what extent?

"Q. That's right, to what extent?

"A. This patient had, from her clinical history, had gotten along very well up until the time of the accident, and then at the time that I first saw her I made a notation that she was in earliest heart failure, which meant that the left side of the heart was failing; that the blood was damming back into the lungs.

"Q. Well, did it, in this case, from your observation in this case?

"A. I believe it did."

The foregoing testimony, while not entirely clear, is such that the jury could reasonably construe the series of questions and answers as an opinion by Dr. Stubbs that the accident aggravated the rheumatic heart by causing or precipitating early heart failure.

658

Having concluded that there was an expert opinion which amounted to substantial evidence from which the jury could reasonably find that the aggravation of plaintiff's permanent, pre-existing heart disease caused the development of congestive heart failure sooner than it would have developed but for the aggravation, the question still remains whether such is a permanent injury. Is an injury permanent (in the sense of supporting or justifying damages for permanent injury as a separate and distinct element of damages) which only hastens one step in a permanent progressive disease, when that step in the progression of the disease probably would occur in any event? Plaintiff's doctors testified that rheumatic heart disease with mitral stenosis and congestive heart failure are permanent conditions. We have concluded that an aggravation which results in adding a permanent condition to two other permanent conditions, is within itself a permanent injury and this, even though the additional permanent condition probably would have occurred in any event at some indefinite future time.

We have carefully considered the cases of Kimmie v. Terminal R. R. Assn. of St. Louis, 334 Mo. 596, 66 S. W. (2d) 561 and Weiner v. St. Louis Public Service Co., (Mo. Sup.) 87 S. W. (2d) 191, relied upon by defendant as authority for the proposition that the evidence in this case does not justify an award of damages for permanent injuries. We have also considered many other cases which have involved the question of the necessity for substantial evidence of permanency to support a recovery for permanent injuries, including Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644; Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S. W. (2d) 328; Cox v. M.-K.-T: R. Co., 335 Mo. 1226, 76 S. W. (2d) 411; and State ex rel. K. C. Pub. Serv. Co. v. Shain, et al., 350 Mo. 316, 165 S. W. (2d) 428. We think each of these cases correctly rules on the facts of the particular case. It is well established that before recovery may be had for permanent injuries, the permanency of the injuries must be shown with ██ reasonable certainty and likewise that the causation of such permanent injuries must be shown with reasonable certainty; and when evidence goes only to the extent of showing that a certain condition might or could have been caused by one of two causes for only one of which defendant is liable, such is not a substantial showing of which of the causes produced the condition and furnishes no basis from which a jury may reasonably find the cause.

In Weiner v. St. Louis Pub. Serv. Co., supra, we reviewed the medical testimony and concluded that there was no evidence from which the jury could find that an aggravation of a permanent arthritic condition was itself a permanent injury. We specifically held there that there was no expert opinion adduced in evidence to

the effect that the aggravation of the arthritic back was a permanent injury.

In Kimmie v. Terminal R. R. Assn., supra, we held that there was no substantial evidence that a bone tumor suffered by plaintiff was caused by the fall in question. The medical opinion in that case was that the tumor "might, could, or would" result from the fall described. We said that such an opinion was not substantial evidence, it showed only scientific possibility.

In the present case, however, there was an expert opinion that the accident probably hastened 'the development of congestive heart failure. This opinion in connection with other evidence that plaintiff was able to work before the accident and unable to work after the accident, that she had congestive heart failure within three months following the accident, and that since the accident her condition has become progressively worse, did constitute substantial evidence from which the jury could reasonably find that plaintiff sustained some permanent injury as a result of the accident.

We therefore hold that the trial court did not err in giving Instruction No. 17.

■ Defendant further contends that the trial court committed reversible error in permitting plaintiff's attorney to make certain uses of a deposition on cross-examination of defendant's operator. The operator was asked on cross-examination in what distance he could stop the streetcar going five to ten m.p.h. He answered that at five m.p.h. he could stop in about 20 feet and at ten m.p.h. in about 45 feet. Plaintiff's counsel then, over the objection of defendant, was permitted to read a portion of a prior deposition of the operator-witness, which disclosed that, in answer to the question of what was the shortest distance in which he could make an emergency stop with safety to his passengers, the operator answered: "Well, I would say 20 to 25 feet, or something like that." Counsel for plaintiff and the witness then engaged in a series of questions and answers from which it appears that counsel was insisting that the prior answer was inconsistent with present testimony, and the witness was insisting that the same speed wasn't involved and that his testimony was consistent.

In the other instance complained of, counsel for plaintiff asked the witness whether he sounded a horn when he "hit Gravois." The witness answered that he didn't, then the following occurred:

"Q. Do you remember this question being propounded to you: 'That's right, but you didn't sound any horn when you were crossing Gravois?' And your answer was: 'I didn't have to'?"

After the above question had been propounded, defendant objected on the ground that there was nothing contradictory in the testimony given at the trial compared with that given in the deposition and that such constituted an improper use of the deposition in cross-examination. The court ruled to the effect that he would leave it to the

jury to determine whether or not the testimony was consistent. No answer was given by the witness to the question and the subject was not pursued further by counsel.

We are of the opinion that this second instance, at least, constituted improper use of a deposition. However, we are also of the opinion that, even assuming that both instances described involved improper ▮ use of a deposition in the examination of a witness, nevertheless a careful review of the record involving the two instances indicates clearly, we think, that there was nothing in them sufficiently prejudicial to compel the granting of a new trial. Mo. R. S. 1949, Sec. 512.160, Winkler v. Macon Gas Co., et al., 361 Mo. 1017, 238 S. W. (2d) 386, 393.

▮ Defendant contends that the verdict is excessive. Plaintiff suffered abrasions and a laceration of her right knee, abrasions of the right hip and right side; there was a bruise about the size of a baseball at the region of the right hip bone; her knee continues to bother her in that it continues to ache, but does not disable her in walking; she sometimes gets a "catch" in her hip which is painful and interferes with walking; she has pain in her neck at times, and occasionally a "catch" in her neck; she has been unable since the accident to lift her right arm over her head and her right shoulder aches; she feels that she suffers some loss of memory; she has insomnia; she is more nervous than before the accident; she began menstruating immediately after the accident which continued until after the delivery of her baby in August, 1948.

Dr. Tibe testified on behalf of plaintiff that both plaintiff's knees were bruised; that her head was bruised; that her right knee was cut; that she has been suffering from irregular menstruation; and that a weakened uterus resulted from the accident; that plaintiff received an injury to her seventh cervical vertebra and to the lumbar and sacral regions of the spine. No X-rays were introduced in evidence and plaintiff in her deposition, which, by agreement, was read at the trial in the absence of plaintiff, stated that no X-rays had been taken of her neck.

Plaintiff was being treated by Dr. Tibe at the time of the trial by short-wave deep therapy for her neck, shoulder, arm, leg, hip, and knee.

Plaintiff was confined to her bed for a period of a month immediately following the accident, and shortly thereafter was confined to the hospital for a period of days, then returned home and remained in bed either at home or for certain periods in the hospital until after the delivery of her baby the latter part of August, 1948. It appears from plaintiff's evidence that bed confinement was caused by a threatened miscarriage.

We have heretofore reviewed in some detail the testimony concerning the aggravation of plaintiff's pre-existing permanent heart

condition. It is difficult to attempt to separate the effect and duration of the injuries, including the aggravation of the heart condition, which plaintiff received in the accident from the results of plaintiff's pre-existing permanent and progressive heart disease. There was no testimony that any of the injuries other than the heart aggravation were permanent. Hospital records introduced in evidence as Defendant's Exhibits D and E, contained records of plaintiff's confinement in, or treatment at the clinic of, Firmin Desloge Hospital at various times beginning in 1935 and disclosed entries concerning confinement and treatment for various pregnancies and for rheumatic heart condition. One of these confinements in the hospital was in April, 1948, and the records covered various periods from February 28, 1948 to the time of the delivery of plaintiff's child on August 21, 1948. No entries appear in such records relating to the treatment of any condition of plaintiff other than her pregnancy and heart condition.

As heretofore noted, plaintiff and members of her family testified that prior to the accident plaintiff was able to do her housework and her washing and ironing, but since the accident was unable to perform any work.

The testimony shows that plaintiff's condition at the time of the trial was very serious and that it had become progressively worse since the accident. The testimony, probably necessarily so, does not furnish any clear basis for a jury to determine the degree to which the injuries sustained at the time of the accident contributed to the condition of plaintiff at the time of the trial as contrasted with the natural progression of the pre-existing, permanent condition of plaintiff prior to the accident. The medical evidence, heretofore noted, is clear to the effect that plaintiff's pre-existing heart condition was serious and progressive even in the absence of aggravation.

Having in mind the conditions under which we may interfere with the size of a verdict of a jury, having in mind the present economic conditions and other circumstances, and taking into consideration the fact of plaintiff's serious permanent and progressive pre-existing condition, the speculation involved in attempting to separate and segregate the injuries resulting from the accident, from plaintiff's condition prior to the accident and the probable consequences thereof, and having in mind that there was no recovery for any loss of earnings or hospital or medical expense, we are of the opinion that the verdict in this case is excessive by at least the sum of $4,000. See Adelsberger v. Sheehy, 336 Mo. 497, 79 S. W. (2d) 109.

If, therefore, within fifteen days from the date of the filing of this opinion, plaintiff will enter here a remittitur of $4,000, the judgment will stand affirmed in the sum of $10,000 as of the date of the original

662

judgment. Otherwise, the judgment will be reversed and the cause remanded for a new trial. *Van Osdol* and *Lozier, CC.*, concur.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the court. All the judges concur.