Carl Oliver McDONALD, Respondent,

v.

MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a Corporation, Appellant.

No. 51262.

Supreme Court of Missouri, Division No. 2.

March 14, 1966.

Motion for Rehearing or to Transfer to Court En Banc Denied April 11, 1966.

Thomas R. McGinnis, St. Louis, Cullen Coil, Jefferson City, for respondent.

Fordyce, Mayne, Hartman, Renard & Stribling, Alphonso H. Voorhees, Eugene F. Jordan, St. Louis, for appellant.

PRITCHARD, Commissioner.

In this suit for personal injuries by respondent railroad employee against his employer tried to a jury under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., respondent has judgment, after a $10,000 remittitur ordered by the trial court, for $38,541.

Appellant, seeking reversal and a new trial, urges in its Point I error in the trial court's giving of respondent's requested Instruction No. 5 on the measure of damages, contending (A) that it referred generally to the "occurrence shown in evidence" when the evidence clearly showed more than one occasion of injury, and that the instruction permitted damages to be awarded for either or both injuries; (B) that the medical testimony is conflicting and does not clearly support or authorize a finding that respondent's conditions set forth in the instruction resulted from or were caused by the accident of July, 1962, and same permitted the jury to speculate on such cause; and (C) that the instruction allowed the jury to consider and speculate as to loss of earnings, both past and future, when there was no clear evidence to support such consideration. By Point II appellant urges that the judgment is excessive.

The evidence did reveal that respondent had suffered a previous head injury to that alleged to be the result of the July, 1962, accident. Respondent testified that in the fall of 1958 he was hurt in the back of the head by being struck with some unknown object, rendering him unconscious. He went to a Fulton, Missouri, hospital for three or four days, and was under the care of a doctor. During the time he was in the hospital respondent had some draining from his ear, and had headaches at that time. He recovered from the injuries suffered in the mishap, and thereafter worked at cutting stove wood for sale, using a chain saw and hauling the wood to customers. He climbed and trimmed trees from 1958 on. He worked for one Preston McCall cutting and sawing logs, baling hay, driving cattle and hauling corn. After the fall of 1959 he slaughtered beef and hogs two days a week, that work being strenuous and heavy, for two winters of that seasonal work. He was able to do that work without difficulty. On other than the two days a week during that time, he helped several farmers, and helped tear down and load on a truck metal from a hopper 25 feet high. All of this time respondent worked regularly, and had no difficulty doing the work. Respondent's various employers during this time testified similarly that he was a dependable worker, doing heavy work, and that they had never heard him complain about any physical condition or inability to do the work, or of dizzy spells.

On February 18, 1961, respondent was examined for employment with appellant by Dr. T. C. Beckett, a doctor on its medical staff at Boonville, Missouri. A general examination was given, including: vision,

hearing, blood pressure, height, weight, color of eyes and hair, and the eyes, ears, nose and throat. Nothing abnormal was revealed about his health: his reflexes were normal, his hearing was normal in his right and left ear (twenty-twenty). From his examination respondent was in good health, and Dr. Beckett recommended him for employment as being capable of doing the strenuous work of the railroad.

On July 2, 1962, respondent and his foreman were engaged in fixing the brakes on the railroad motor car which had not been working well for several days. The foreman told respondent to get a tarpaulin and lay it between the rails, to lie on it, and the foreman would shove the motor car over him. This was done, and as they were working respondent heard the foreman say, "Let the damn thing go." Before respondent could get straightened around and lie prone again between the rails, the motor car was moving and he was hit on the side of the head by the grease housing on the axle, occasioning the injury for which he sued.

After being struck on the head, respondent lay on the track for two to four minutes, then got up and sat on the motor car for 15 or 20 minutes. He was dizzy and his head was numb. Later as the foreman and he continued their work at a point about 10 miles away, respondent noticed some whitish material streaked with pink which had come out of his ear which was very sore and he could hardly hear out of it. He took aspirin to take care of his headache and dizziness, and a ringing in his ear. After 4:00 p. m. respondent went home where he lay across the bed until about 9:00 p. m. He felt nauseated and vomited, and found blood on his pillow the next morning.

Respondent saw a Dr. Hill on July 5, 1962, who examined him, but did not treat him, and recommended that he see a company doctor. He then saw Dr. Beckett on July 6, who examined him and sent him to the hospital for X-rays. There respond-

ent stayed for the rest of the week, during which time the doctor told him that his inner ear was damaged and that he had to give medicine through respondent's nose. Upon release, respondent's dizziness was not so bad except when he bent over. At the suggestion of his counsel, respondent saw Dr. Robert Lam of St. Louis, Missouri, in August, 1962. In September, 1962, he saw Dr. Beckett again and returned to work on the extra gang of the railroad until February 23, 1963, when he quit. During this time he still had dizziness, headaches and a "buzzing" in his ear, all of which would be aggravated when he bent over. He also was bothered by nausea and vomiting, especially in the morning. Subsequent to quitting the railroad, up to July, 1964, respondent suffered four "blackouts," and testified that prior to July 2, 1962, he had never suffered such.

Dr. Lam testified that in his final diagnosis respondent had a traumatic concussion with the residuals of that manifested by postural dizziness, deafness in the left ear (25 to 30 per cent hearing loss), headaches, personality changes and a convulsive disorder manifested by akinetic seizures (a form of epilepsy)—a disturbance of consciousness, suddenly becoming unconscious, not knowing what he was doing, but without having a typical convulsion as a grand mal.

■ There was evidence from respondent's hospital record entered following his 1958 head injury (from being hit on the head by beer bottles and possibly a brick) that he was unconscious for the 24-mile ride to the hospital and for some time after his admittance. He had a fracture at the base of the skull, an absent abdominal reflex and an upswing toe reflex, and that he was bleeding from the left ear intermittently for two days. The significance of the loss of abdominal reflexes and the upswing toe reflex was testified to by Dr. Lam (respondent's medical expert) to "mean that the trouble was on the right side of the brain" and a "right-sided brain disturbance." Dr. George E. Roulhac (ap-

pellant's medical expert) testified that the upswing toe reflex is a definite sign of brain injury, and that he felt that respondent's convulsive disorder was more likely related to the 1958 injury, because of loss of consciousness for a lengthy period of time and the upswing toe reflex, than the 1962 injury, because it only dazed him and did not render him unconscious. There was thus an issue of whether respondent's condition at trial time was the result of two different injuries. However, under other evidence of causation, and considering respondent's testimony that he recovered from the 1958 injury, and all the instructions of the court, we are of the opinion that the jury could not have been misled as to which injury was referred to in Instruction No. 5 as being "the direct result of the occurrence shown to you in evidence." Respondent's main verdict-directing Instruction No. 2 referred to the second day of July, 1962, as the day when he was working on the motor car and that he then sustained injury to his person as a direct result of being struck by a portion of the underneath portion of the car. Instruction No. 3, given at appellant's request, told the jury in part that before it could return a verdict against appellant, "You must further find and believe from the evidence that the condition of which plaintiff complains, resulted from an occurrence on July 2, 1962 and not from his injury of October of 1958." Instructions to the jury must be read together, and when done so in this case, as above set forth, it is apparent that there was submitted no misleading, confusing issue, or puzzling situation (as contended by appellant), that would permit the jury to award damages for either or both injuries suffered by respondent in 1958 and 1962. See Perry v. Stockhoff Supply Company, Mo., 356 S.W.2d 92, 95 [1]; Coit v. Bentz, Mo., 348 S.W.2d 941, 945 [6,7]; Faught v. Washam, Mo., 329 S.W.2d 588, 596 [10–12]; Goodman v. Missouri Pacific Railroad Company, Mo., 312 S.W.2d 42, 48 [6]. Appellant's cited case of O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S.W. 55, on the issue of whether a removal of a portion of plaintiff's ulna was caused by a thumb injury or subsequent infection, is not in point because there no clarifying instruction was involved. Appellant's Point I(A) is overruled.

■ Under Point I(B) the contention is made that the medical testimony is conflicting and did not show causation of plaintiff's 1962 injury and his condition (of past and future pain and suffering, permanent injuries, etc.) as set forth in the damage Instruction No. 5. Appellant does not point out wherein, if so, respondent's medical evidence in itself is conflicting. From our reading of briefs and the record, the only conflict in medical testimony is between respondent's and appellant's witnesses, and that conflict is, of course, to be resolved by the jury. With respect to the second portion of the contention, Dr. Lam was given a hypothetical question covering respondent's previous and present physical condition, and the accident of July 2, 1962, and was asked if he had an opinion, based on reasonable medical certainty, as to whether or not the incident of July 2, 1962 caused the condition as he found it. His answer was "Yes, sir." Appellant says the answer did not establish causation between the injury and the accident of 1962. Dr. Lam later testified that respondent's seizures all *relate back* to the injury received on the accident of July 2, 1962. At another place Dr. Lam testified concerning the 1962 accident of respondent (a final diagnosis): "In my opinion, he did not have a mild injury. I think he had sharply localized injury to the base of the skull close to the ear enough to fracture the petrous bone, so that he had an otorrhea. Now, apparently there is enough evidence to show that he did have a flowing of fluid from that ear right after the injury, and he had also deafness; so to me this means that a fairly severe injury hurting, injuring that eighth nerve had occurred. But the injury, the location, was not over the upper portions of the skull enough to affect the brain as a whole; so he did not lose consciousness.

This mainly was an injury at the base affecting the eighth nerve and subsequently *causing* him to have these blackouts, because the base of the brain, which controls consciousness, is in this area. So the *persistent headache, the dizziness, the deafness, to me indicate very clearly he had a fairly severe injury*, without loss of consciousness, affecting the base of the brain and the base of the skull. \* \* \* *He has akinetic seizures, in which he suddenly blacks out.*" (Our emphasis.)

It is true that the doctor's answer to the hypothetical question first above mentioned was only that he had an opinion as to causation and he did not state what that opinion was. However, the further testimony of Dr. Lam was that respondent's seizures *related back* to the 1962 accident. (We note that appellant's medical witness, Dr. Roulhac, testified that the condition he found *related back* to the 1958 injury.) The reasonable construction, in the context used, of both these doctors' words "related back" is that the conditions found were caused by the accidents referred to. Dr. Lam further testified that blackouts were *caused* by the injury to the eighth nerve, and physical conditions then described by him indicated to him that respondent had a fairly severe injury. Of some value also is respondent's own testimony of his conditions before and after the July 2, 1962 incident. The testimony, reasonably construed, established with reasonable certainty the causation of respondent's injuries, and that is all that is required. The form of the language used does not deprive the statement of its evidentiary value. Walker v. St. Louis Public Service Co., 362 Mo. 648, 243 S.W.2d 92, 95; and compare Ketcham v. Thomas, Mo., 283 S.W.2d 642, 649 [10]. This is not a case where the medical expert used words such as "might" or "could" in connection with causation so as to render the testimony insubstantial. Cox v. Missouri-Kansas-Texas Railroad Co., 335 Mo. 1226, 76 S.W.2d 411, is therefore of no help to appellant. Point I(B) is overruled.

Appellant says that there was no clear evidence to support a consideration by the jury of loss of earnings, past and future, of respondent [Point I(C)], as submitted in Instruction 5. Respondent earned $88.00 for a 40-hour week. A calendar (Plaintiff's Exhibit 7) was admitted into evidence showing the days worked by respondent (which is the same as interrogatories answered by appellant) until he quit in February, 1963. Thereafter, respondent did some commercial fishing. He received a 30-horsepower outboard motor for two weeks' work operating scales in weighing sand trucks for a Mr. Laughlin from whom he received no salary. He owned a 33 acre farm but had no income from it since 1963 (when he sold some hogs, the value of which was not shown). In answer to a question as to what his earnings had been since he terminated with the railroad, respondent testified: "Wouldn't be hardly anything. Wouldn't be enough to even count. Make a few dollars fishing to buy groceries." Appellant says the value of this outside remuneration not being shown permitted the jury to speculate as to "actual" loss of earnings, and there was no substantial evidence upon which it could base a determination thereof with any degree of reasonable certainty.

Appellant cites Seymour v. House, Mo., 305 S.W.2d 1. There was in that case a total absence of the plaintiff's compensation as a concrete finisher before the injury, or what he had received after the injury in performing other work in supervising, dealing with contractors, taking on jobs and generally running a concrete construction business (which was held in his wife's name as a straw party), or of the profits of the business. The court held properly that there was insufficient evidence upon which the jury could determine past earnings as required by the damage instruction given. The court, in the Seymour case, loc. cit. 305 S.W.2d 3 [1–3], stated the rules upon recovery of personal earnings and wages as an item of special damages: "In order to recover for

a loss of past earnings as special damages, the evidence as to the value thereof must be reasonably certain, so as to eliminate mere speculation. (Citing cases) Or, as sometimes expressed, the evidence must afford a basis for a reasonable estimate of the amount of the loss." Here, the jury was able to determine how much respondent received from appellant prior to the termination of his employment. Thereafter, all respondent received was some amount from the sale of hogs, an outboard motor for services in weighing sand trucks, and a few dollars from fishing to buy groceries—"hardly anything." Under the evidence it could reasonably be found that respondent's injuries were such that he suffered damage by reason of no longer being employable in his position with appellant where his wages were $88.00 per week. Although respondent's evidence does not show with exactitude how much he was able to reduce his wage loss by outside employment (selling 1963 hogs, commercial fishing, and the value of an outboard motor for two weeks' work), yet the uncertainty as to these relatively small amounts will not preclude recovery. Shechter v. Brewer, Mo.App., 344 S.W.2d 784, 791 [7]. See also Northcutt v. St. Louis Public Service Co., Mo.App., 48 S.W.2d 89, 91 [2, 3], where the plaintiff showed what his earnings were prior to injury, but did not show definitely what his earnings were in different employment, as a salesman, subsequent to injury. It was there said: "The plaintiff, being injured by the tortious act of the defendant, is not required to show his loss with mathematical accuracy. A reasonable degree of certainty, in view of the nature of the case, is all that is required of him. (Citing cases) Where, as here, the plaintiff shows what his earnings were prior to his injury, in his usual work or employment for which he was peculiarly fitted, and which he was compelled to abandon on account of his injury, he ought not be disallowed substantial compensation for loss of earnings because he is unable to show with precision the amount

he actually earned, or was able to earn, in some other work or employment, subsequent to his injury."

As to evidence of loss of future earnings, the medical evidence is that respondent is not industrially employable, and his condition is permanent. This is sufficient to take to the jury that issue, and for it to consider and determine what, if any, earnings respondent would lose in the future. Since his injury, respondent has earned very little. Throughout his life, the jury could determine his loss of earnings upon the factual viewpoint of what he would have earned but for his injury. Coffman v. St. Louis-San Francisco Ry. Co., Mo., 378 S.W.2d 583, 600. See also McGarvey v. City of St. Louis, 358 Mo. 940, 218 S.W.2d 542, 546 [5, 6] (a case primarily involving impairment of ability to work); Belisle v. Wilson, Mo., 313 S.W. 2d 11, 17 [7–11]. In its briefs, appellant points up the distinction between future loss of earnings and impairment of ability to work. "This distinction is made on the theory that an impairment of the *power* to work is an injury to a personal right ' * * * wholly apart from any pecuniary benefit.' " Bone v. General Motors Corporation, Mo., 322 S.W.2d 916, 922 [5, 6], 71 A.L.R.2d 361. Here, Instruction No. 5 did not submit impairment of ability to work, but allowed the jury to consider such loss of earnings as it might find and believe from the evidence respondent would with reasonable certainty sustain in the future as a result of his bodily injuries. Although there was testimony from Dr. Lam, respondent's medical expert, that respondent should not work around machinery and in high places and was not "industrially employable," there was evidence from which it might be inferred that he could do some work (i. e., he weighed sand trucks and did some commercial fishing) but he testified that his past income from these pursuits was "hardly anything." From the size of this verdict, it is apparent that the jury did not allocate a total loss of future wages based upon past wages for the 40

odd years of respondent's life expectancy. The jury was entitled to find, upon this record, that respondent's loss of earnings in the future would be substantial, considering the permanency of his injuries, and the fact that he could no longer do the type of work for which he was qualified. Point I(C) is overruled.

▮▮▮ Appellant claims the judgment is excessive. At the time of the accident, July 2, 1962, respondent was 30 years old. At the time of trial he was 32 years of age. According to U. S. Department of Health, Education and Welfare, National Office of Vital Statistic's life tables read into evidence, respondent's life expectancy (age between 30 and 35 years) was 40.7 years. The evidence of injury, taken most favorably to respondent (Riggs v. Metcalf, Mo., 315 S.W.2d 791, 796 [6]), is that he suffered an injury to his head on the date of the accident resulting in ringing of the ear, loss of hearing 25 to 30 per cent in the left ear, and a permanent condition of akinetic seizures manifested by blackouts, four of which had been suffered by respondent to the time of trial. He is no longer industrially employable. "No one would hire him with these blackouts, because he is a danger to himself and others, particularly in operating machinery or if he is working at heights above the ground." Respondent's hospital bill was $397.31, and his doctor's bill was $560.00. He will need constant medical treatment in the future at a cost of $300.00 to $400.00 per year. If he were hospitalized there might be a cost of $750.00 to $1,000.00 per year. His loss of earnings to the time of trial was about $9,000.00. His wages at $88.00 per week amounted to $4,577.00 per year. When he quit work on the railroad, February 23, 1963, he was dizzy and had headaches. At trial time his nausea continued and he would vomit, especially early in the morning. He had done practically no work after leaving the railroad; he was irritable, and suffered a personality change, and has not been emotionally stable. Respondent's doc-tor's final diagnosis is set forth above under Point I(B).

The jury reasonably could have found that respondent's special damages to time of trial were in excess of $10,000.00. He would incur further medical costs of $300 per year for his lifetime. His loss of wages could amount to $4,500.00 per year for the rest of his life at manual labor which he is no longer able to do. We are of the opinion that under the evidence the judgment, as remitted from the verdict, is not excessive. Appellant's cases do not demonstrate that this judgment offends the rule of reasonable uniformity of judgments for comparable injuries. A $60,000.00 judgment was reduced to $45,000.00 for a 19 year old youth with 50 per cent permanent disability for doing manual labor, whose medical expenses were $2,172.62, and who had no loss of wages or specific showing of impairment of earning capacity, in Caraway v. Atchison, Topeka and Santa Fe Railway Co., Mo., 318 S.W.2d 331. Gain v. Dorward, Mo.App., 357 S.W.2d 193, involved injuries to a 35 year old housewife, with no evidence of loss of earnings, wherein the court of appeals sustained a $10,000 judgment upon verdict.

▮▮▮ In cases where excessiveness of judgment is urged, the rule is that each case must be decided upon its own peculiar facts. Myers v. Karchmer, Mo., 313 S.W. 2d 697. The age of the plaintiff, and the nature, extent, and permanency of his injuries are paramount factors in determining such issue. Young v. St. Louis Public Service Co., Mo., 326 S.W.2d 107. As in any case, the weight of the evidence as to the injuries suffered, and the results thereof (as to permanency, incapacity to work, loss of income, and the nature of such injuries), is for the jury to determine. Breland v. Gulf, Mobile and Ohio Railroad Company, Mo., 325 S.W.2d 9, 14 [1]. We are not persuaded that for this respondent with 40.7 years expectancy of life, who had loss of wages and medical expenses of over $10,000.00 at the time of trial, with 25 to

30 per cent loss of hearing in his left ear, a continued ringing in his ear, who has suffered personality changes, and who is industrially unemployable for the remainder of his life, a $38,541.00 judgment is excessive. Point II is ruled against appellant.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.