John D. CRESS and Dianna M. Cress, Plaintiffs-Respondents,

v.

John H. MAYER, III, M. D., Defendant-Appellant.

No. WD 31656.

Missouri Court of Appeals, Western District.

Dec. 22, 1981.

John E. Redmond, Kansas City, for defendant-appellant.

Michael Callen, Barnett & Lerner, Chartered, Ronald J. Stites, Ronald R. Holliger, Koenigsdorf, Kusnetzky & Wyrsch, Kansas City, for plaintiffs-respondents.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

DIXON, Judge.

Defendant appeals from a jury verdict in favor of plaintiffs in a suit for medical malpractice. The jury awarded $325,000 to John Cress and $7,500 to his wife, Dianna Cress.

The issues on appeal synoptically stated are claims of error in submission of issues not supported by evidence or within pleadings and therefore barred by the statute of limitations, error in instructions, improper impeachment of a witness, improper argument as to witnesses said to be equally available and excessiveness of verdict.

John Cress was operated on by the defendant on April 16, 1973. For injuries arising from what Cress alleges was the malpractice of the defendant doctor, this lawsuit ensued.

John Cress' symptoms developed in the spring of 1973 when he began having a shocking sensation in his neck and chest when he turned his head from one side to the other. He first sought medical attention at the Research Medical Center emergency room where he was advised to see an orthopedic surgeon. Cress was examined the following day, March 19, 1973, by Dr. Martin Evenson, an orthopedic surgeon. Evenson diagnosed the plaintiff's problem as severe muscle strain on the left shoulder and suggested that Cress obtain therapy at the Ford plant, plaintiff's place of employment.

Cress was also examined by his family doctor, Dr. Charles Empson, who prescribed muscle relaxants. The testimony of John and Dianna Cress conflicted as to the exact date of that visit, but it was uncontradicted that it took place immediately prior to or right after his first visit to the defendant.

Cress first saw the defendant, Dr. Mayer, III, on March 23, 1973, because he was experiencing chest pains. Plaintiff had been a patient of defendant's associate, Dr. Benoit, when his lung collapsed in 1969. Benoit had treated him at that time without surgery. Evenson, the orthopedic surgeon suggested he see his "lung doctor" because of the chest pains.

There was conflicting evidence regarding plaintiff's March 23rd visit to the defendant. John Cress testified that the defendant examined him by raising his arm, turning his head from left to right and listening to a stethoscope, which lasted approximately 5–6 minutes. After taking plaintiff's medical history, the defendant told plaintiff he had thoracic outlet syndrome. Defendant doctor explained that plaintiff had an extra rib which was pressing on an artery and vein and that he might lose his arm if the rib were not removed. They discussed the operation which consisted of "just a two-inch incision underneath the arm and go up with a special little tool and cut the rib out and bring it back out and no problems." The defendant doctor did not inform plaintiff of any risks involved in the surgery except that it was a simple operation and there was a one in a million chance of death. The defendant doctor told plaintiff that physical therapy would not help and at that time scheduled surgery to remove the rib.

Dianna Cress testified that the defendant explained that John had an extra rib which was resting on an artery, that John would not respond to physical therapy or chiropractic adjustment, and that the defendant wanted to schedule surgery to remove the rib right away. The defendant said the operation was simple, that it would be done a new way by making a small incision underneath his arm, going in with a tool and removing the rib. Surgery was scheduled on that date for April 16, 1973.

The defendant, Dr. Mayer, III, testified that he performed a complete history and physical examination on Cress on March 23, 1973. He conducted Adson maneuvers, which consist of raising the arms, turning the head from one side to the other, putting the shoulder in different positions, and simultaneously feeling the pulse to test the blood supply to the arm. He took Cress' blood pressure and found that the defendant did not have a pulse in his "left upper extremity" when his arm was raised. The examination further revealed a bruit, which indicates blood going through a compressed

artery, over the left collarbone when Cress' arm was elevated.

The defendant testified that he diagnosed Cress' symptoms as severe thoracic outlet syndrome and prescribed surgery to remove the first rib. He did not prescribe any other kind of treatment and stated that physical therapy would "absolutely not" have helped. If the surgery were not performed, there was a risk that the problem would be aggravated with time and, more importantly, that a blood clot could form in approximately four minutes if the patient slept with his arm above his head. The defendant testified that he advised the plaintiff of the risks involved in the surgery: sudden death from anesthetic complications, "fibulation" of the heart, infection, artery clotting, danger to the nerves, numbness, paralysis, and loss of life or limb.

The defendant examined the records of plaintiff's visit to the Research Hospital emergency room before performing the surgery, but did not look at the records of Dr. Evenson, the orthopedic surgeon because "it had no bearing on the problem." The records from Research Hospital indicated that plaintiff had a negative Adson sign on March 18, 1973, which defendant conceded was not consistent with severe thoracic outlet syndrome. Defendant agreed with the statement that "notwithstanding what the emergency room records said . . . and Dr. Evenson, as long as [he—defendant doctor] made that finding that was the finding."

The defendant did not examine the plaintiff again after the March 23rd visit before the surgery on April 16th. The defendant stated it was not possible for the Adson maneuvers to be negative or the bruit to be absent upon a second examination. During that three-week period, Cress resumed his everyday activities but did not go to work because the defendant put him "on a medical." Dianna Cress testified that he appeared to get better every day and was not complaining.

Cress stated that he did not see a doctor on April 14, 1973, when he entered the hospital, nor on April 15th, nor on April 16th, after the surgery; but the defendant stated that he had a conversation with Cress in the hospital either April 14 or April 15. The defendant did not examine Cress after the surgery while he was in the hospital.

The defendant was examined by Dr. Mayer, Jr., (Defendant's father), and Dr. Benoit on the two days following surgery, and he complained to them that his arm was numb and tingling, beginning to burn, and he was only able to move his fingers. Plaintiff was released from the hospital three days after the surgery. He called defendant at his office that day because his incision was red and swollen and was "stinging." He did not visit defendant's office until April 24, 1973, when he was examined by Dr. Mayer, Jr., who removed the stitches. After that visit Cress had daily telephone conversations with the defendant because the incision was "pulling and oozing and the stitches were opening up." By the end of the week, the incision was two inches in diameter and at the next office visit on April 27th, Dr. Benoit packed the wound with sterile stripping. Defendant examined Cress on May 1, 1973, for the first time after the surgery and continued to pack his wound with sterile stripping until plaintiff's office visit on May 15, 1973. Defendant stated that the wound was healing at that time and Cress had full range of motion in his upper left extremity. The defendant released him to return to work on May 21, 1973. The defendant stated that the wound was not infected before May 15, 1973, that he did not order a complete blood count or culture to determine if it was infected, and that he never advised Cress of the possibility of infection. He stated that "[I]f [he] had one thousand patients with the insignificant wound [Cress] had one would expect a very small number to complain as vociferously as he was."

After Cress returned to work, his arm continued to weaken and became smaller. He was examined by the defendant on August 7, 1973, and the defendant referred him to a neurosurgeon, an associate of Dr. Clough. The defendant stated that he did not observe the muscle wasting at that

time, although his letter of that date to Dr. Clough's associate stated that the plaintiff had noticed "what apparently is some left deltoid wasting."

Dr. Clough testified that he first examined Cress on August 13, 1973. It was Clough's assumption that Cress had a type of traction injury, but he had no opinion as to the cause of the injury. He stated he did not believe the operation was negligently performed. Further, he believed that Cress received proper post-operative care and that the muscle weakness might be due to disuse atrophy because of lack of exercise.

Dr. Harold Kletschka, a thoracic surgeon, stated that he had treated hundreds of patients with thoracic outlet syndrome and had never performed surgery to treat the problem. He stated that at the least a period of observation is always necessary to determine if physiotherapy is required and that physiotherapy always has a presurgical role. It was his opinion from Cress' medical records that there was no indication for surgery. He was of the opinion that Cress was misinformed about the risks involved in the surgery based on a hypothetical question posing factually the plaintiff's version of the defendant doctor's statement of the risks. Kletschka testified that the cause of the plaintiff's disability was a mechanical injury to the nerves of the brachial plexus during surgery and that the injury was below the standard of care of the defendant's profession. This response was made to a rather inept hypothetical question, but in the context of an examination which had developed fully the treatment of plaintiff and his condition. He further stated that John Cress' loss of strength in his arm was permanent and he would be unable to perform overhead work which required his left arm or activities which involved fine use of his fingers. There was also a possibility of continued scarring which might lead to causalgic problems and the wasting was not due to disuse.

Dr. Charles McGrath first examined Cress on March 9, 1976, and he diagnosed the disability as an injury to the nerve cords extending from the chest to the shoulder which resulted from the surgery. He testified that no case of thoracic outlet syndrome should be taken to surgery without first undergoing an exercise program or physical therapy and that 50–70 percent of patients with that problem respond to physical therapy. McGrath had never had a patient undergo a first rib resection transaxillary approach, and it was his opinion that Cress was not given enough information to give an informed consent to the surgery. When McGrath examined Cress on March 9, 1976 and June 8, 1976 he found that his other muscles had grown in size and were in a degree of spasm to compensate for the weaker muscles. Plaintiff's scapula falls out with any movement against it, and he has a curvature of the spine because of the uneven musculature on his back. He has weakness of the bicep muscles, and it was McGrath's opinion that the injuries are permanent.

There was testimony from John Cress, Dianna Cress, and James Gallagher, Dianna's father, that John's activities are markedly restricted since the surgery. Before the surgery, Cress had been involved in different sports and had taught karate for five years until the fall of 1973. After the surgery, he quit "working out" with his father-in-law and could not sit still long enough to go to football, baseball games, or boxing matches. Cress now sleeps on his back with pillows elevating his head, neck, and left arm. He dresses himself differently, and has a different job with Ford Motor Company. He is exhausted after work and goes to bed about 8:30 or 9:00 p. m. Plaintiff did exercises after he returned home from the hospital but was not able to do things a ten-year-old could do. At trial, Cress testified that he could not lift his arm above his head, he has a loss of strength, and his neck goes to the right. He experiences a constant burning sensation in the back of his shoulder and his shoulder area is numb. John Cress was 24 years old when he underwent surgery to remove his rib and 30 years old at the time of trial.

Plaintiff submitted disjunctively lack of informed consent, unnecessary surgery, and

negligence in performing surgery. The defendant asserts that the submissions of informed consent and unnecessary surgery were not pleaded and that proof or amendment aside, the claims are barred by the statute of limitations, § 516.140 RSMo (now § 516.105 RSMo 1978), since the claims were not included in the original pleading filed March 26, 1975. The defendant's argument prevails as to the submission of unnecessary surgery and fails as to the submission of informed consent.

Turning first to the issue of informed consent, the plaintiff only saw the defendant doctor once on March 23, 1973 prior to surgery on April 16, 1973. The allegations as to the doctor's statements which form the basis for lack of informed consent relate to that date. From this premise, the defendant argues that the negligent acts were barred since the petition was filed March 26, 1975. This disregards completely the uncontroverted facts that consent was not obtained until April 15th and the operation was performed on April 16.

The conventional rule for the running of the statute of limitations is the date of last treatment. *Laughlin v. Forgrave*, 432 S.W.2d 308 (Mo. banc 1968). *Laughlin*, in construing the statute applicable to this case, § 516.140, focused upon the language "act of neglect," and thus, for most cases, the statute runs when the operation is performed. The present statute, § 516.105 excepts from the statute the fact situation in *Laughlin* and provides for a two-year statute from discovery or from the date when the patient should have discovered a foreign object in the body. The present statute, however, continues the "act of neglect" language, and the rationale of *Laughlin* still applies absent the excepted fact situation of a foreign body or a fraudulent concealment constituting an "improper act" under § 516.280 RSMo 1978. *Swope v. Printz*, 468 S.W.2d 34 (Mo.1971).

For the purpose of this case, it is sufficient to analyze the "act of neglect" embodied in the failure to obtain informed consent. The tort is one of omission under the facts of this case. Plaintiff's theory was

that no information was received before he signed the consent. The defendant doctor could have, but did not, supply the information at any time prior to plaintiff's consent. The date of consent is within the two-year period, and the "act of neglect" in failing to inform continued to at least the date of consent. It is unnecessary to reach or decide the question of whether a lack of informed consent constitutes an improper act under § 516.280 RSMo 1978.

The submitted issue which presents a very real problem with respect to the plaintiff's pleading is the issue of unnecessary surgery. There is simply no direct allegation in plaintiff's petition of any such issue, and the petition read as a whole gives no inference that such a charge was intended. The defendant doctor filed a motion to make more definite and certain and requested that the plaintiff plead with particularity the theories upon which he was relying. That motion was by the trial court overruled. Prior to trial the defendant doctor moved to restrict the plaintiff's evidence to the two grounds of negligence pleaded, negligent performance of the surgery, and lack of informed consent. The trial court denied that motion.

Thereafter, during the testimony in the case, the defendant doctor made timely and appropriate objection to the reception of any evidence on the issue of unnecessary surgery, reciting specifically that such evidence was outside the scope of the pleadings. In the motion for directed verdict at the close of the evidence, the defendant doctor again raised the issue of the admission of evidence on grounds of negligence not specified in the petition. Finally, in the motion for new trial, the defendant specifically referred again to the court's allowing plaintiff to present evidence as to the necessity for surgery over objection because the issue was not raised in the pleadings. He further argued that the theory of recovery for unnecessary surgery was barred by the statute of limitations since raised for the first time by the plaintiff's opening statement to the jury. The defendant doctor has, therefore, raised and preserved his ob-

jection to the introduction of evidence concerning the issue of the necessity for the surgery performed upon the plaintiff. That issue was submitted to the jury by the plaintiff's instruction, and the plaintiff's closing argument to the jury included a lengthy and impassioned reference to the lack of necessity for the surgery as an alternate ground for the jury's finding of negligence.

It is beyond question that when a plaintiff has pleaded a cause of action upon one theory and thereafter attempts to amend the petition to change the theory of the petition, the amendment does not relate back and the new theory of recovery is barred by the statute of limitations. In *Miller v. Werner*, 431 S.W.2d 116 (Mo.1968), an almost identical situation existed. In that case, the plaintiff filed a petition which presented a malpractice action upon a theory of negligent performance of an operation. Thereafter and subsequent to the running of the two-year statute of limitations, the plaintiff amended the petition to allege a cause of action for malpractice based upon informed consent. The court affirmed a trial court order directing a verdict for the defendant at the close of all the evidence. There was no evidence in the case to support the initial theory pleaded of negligent performance of the operation. All of the evidence submitted being upon the theory of a failure to obtain an informed consent, the court said:

> "Where an original petition is merely defective and is made good by amendment, after the running of the limitation period, the statute is held not to apply. * * * Where, however, an amendment introduces into the petition a cause of action entirely new and distinct from that pleaded in the original petition and the amendment is made after the end of the limitation period the new cause will be held to be barred. * * * The tests which must be applied to determine whether * * * the cause of action stated in the amended petition is a new one are * * *: (1) whether the same evidence would support both petitions; (2) whether the same

measure of damages will apply to both." *Mitchell v. Health Culture Co.*, 349 Mo. 475, 162 S.W.2d 233, 236[3, 4]. The general rule is that an amendment will not relate back to the filing of the original petition and save a cause of action from the bar of the statute of limitations "if the proof necessary to support the pleading as amended is different from the proof necessary to support the same pleading before such amendment * * *." *Arpe v. Mesker Bros. Iron Co.*, 323 Mo. 640, 19 S.W.2d 668, 670[3]. See also *Coleman v. Ziegler*, Mo., 248 S.W.2d 610, 615–616[6, 7].

*Id.* at 118. This case is controlling upon the issue presented here since there has been *no allegation* within the period of limitations concerning a lack of necessity for the surgery performed and that theory requires separate and independent evidence for support. Because the plaintiff submitted alternatively and disjunctively three grounds of negligence including quite specifically a claim of unnecessary surgery, reversal is required.

Because the defendant has also attacked the sufficiency of the evidence to support the issues of informed consent and negligent performance of the surgery, those issues require ruling to determine whether the cause is to be remanded for new trial.

Considering first the question of evidence to submit the issue of informed consent, the defendant doctor argues that no expert evidence was presented to authorize that submission. The statement of the legal principle is correct. The rule for submissibility vis-a-vis medical opinion is stated in *Aiken v. Clary*, 396 S.W.2d 668 (Mo.1965), in the following language:

> [W]e hold that plaintiff, in order to sustain his burden of proof, is required to offer expert testimony to show what disclosures a reasonable medical practitioner, under the same or similar circumstances, would have made, or, *stated another way, that the disclosures as made by the defendant do not meet the standard of what a reasonable medical practi-*

tioner would have disclosed under the same or similar circumstances.

*Id.* at 675 (emphasis added).

The defendant's argument is factually flawed. Plaintiff's medical witnesses, Kletschka and McGraw, testified respectively that plaintiff was misinformed and not properly informed. Either medical opinion would support plaintiff's submission of the issue given jury belief of the plaintiff's statement of the doctor's preoperative advice and warning.

On the issue of the negligent performance of surgery, the hypothetical questions are ineptly phrased. They were, however, preceded by a thorough examination of the medical witness on all facets of the case and in that context constitute sufficient evidence to warrant remand for the retrial. The form of the language does not deprive the professional opinion of evidentiary value. *Walker v. St. Louis Public Service Co.*, 362 Mo. 648, 243 S.W.2d 92, 97 (1951); *Smith v. St. Louis Public Service Co.*, 235 S.W.2d 102, 105 (Mo.App.1951); *McDonald v. Missouri-Kansas-Texas Railroad Co.*, 401 S.W.2d 465, 470 (Mo.1966).

The issues with respect to matters arising in the argument, the amount of the verdict, and the re-examination of a medical witness by the plaintiff for impeachment after the plaintiff had called him as an expert witness will not necessarily arise on a retrial of this case and are, therefore, not considered. The issue of jury instructions has been adequately covered in the briefs and is not likely to recur. Judgment reversed and cause remanded for a new trial.

All concur.