**Betty PFEFFER, Individually and as Personal Representative of the Estate of Lowell Pfeffer, Lanny Pfeffer, Angie Pfeffer, Connie Palmer, Deanna Brewer, and Cathy Helfrink, Plaintiffs-Appellants,**

v.

**Michael KERR, Defendant-Respondent.**

No. 13495.

Missouri Court of Appeals,
Southern District,
Division Three.

June 17, 1985.

Gary L. Lewis, David G. Edwards, Lilbourn, for plaintiffs-appellants.

Jeffrey S. Maguire, John L. Cook, Thomasson, Dickenson, Gilbert & Cook, Cape Girardeau, for defendant-respondent.

HOGAN, Judge.

This is a statutory wrongful death action brought by plaintiff Betty Pfeffer and her children. Plaintiffs are the widow and surviving children of Lowell Pfeffer, who died April 7, 1982. Alternatively, plaintiff Betty Pfeffer as personal representative of the Estate of Lowell Pfeffer, deceased, and the surviving children: 1) sought damages for personal injuries sustained by Lowell Pfeffer which did not result in his death and, 2) plaintiff Betty Pfeffer sought damages for personal injuries sustained by her in the casualty which created the other causes of action. The trial court directed a verdict for the defendant in the wrongful death action; the other causes were submitted to a jury, which found for the defendant. Plaintiffs now appeal. They have briefed and argued seven diffuse assignments of error in this court. The assignments of error directed to the trial of the non-death claim will be considered, but the primary question tendered is whether the trial court erred in directing a verdict for the defendant in the wrongful death action.

The casualty which gave rise to these actions was an automobile accident which occurred at or in the intersection of Highway 62 and Eight Ditch Road in New Madrid County on February 4, 1982. At the point of collision Highway 62 is an east-west road; it is intersected on both sides by a secondary road which runs north and south along the west side of a ditch, presumably a drainage ditch. To the east of the intersection there is a bridge over the ditch. Immediately before the accident happened—about 4:25 p.m.—Lowell Pfeffer was driving a pickup truck east on the south side of Highway 62; plaintiff Betty Pfeffer was a passenger in the truck. Defendant Michael Kerr was driving an auto-

mobile south on Eight Ditch Road, proceeding toward the intersection of Eight Ditch Road and Highway 62. At the northwest corner of the intersection, there is a stop sign for traffic southbound on Eight Ditch road.

For whatever reason, defendant Kerr failed to obey the stop sign and collided with the Pfeffer pickup. The pickup went out of control, struck the south rail of the bridge east of the intersection, rebounded, struck and broke the north rail and finally came to rest in the ditch over which the bridge runs. Plaintiff Betty Pfeffer was taken to Doctors Hospital in Poplar Bluff; Lowell Pfeffer was hospitalized at the VA Hospital in the same city. Lowell was discharged from the hospital on February 11, 1982, but he expired suddenly on April 6 and this litigation followed.

As bearing on the issue of causation, or proximate cause of Lowell Pfeffer's death, plaintiffs had the evidence of several lay witnesses. Ronald Albritton saw the Pfeffer pickup going in the ditch as he approached the bridge from the east. He stopped to see if he could be of assistance. He found Lowell "to [Albritton's] notion, ... unconscious." A few minutes later Lowell was "not totally conscious but he was semi-conscious, I would say, he was still dazed, in my opinion, didn't—wasn't coherent at all, ... he could help [himself] in no way."

Donald Gene Moore was an ambulance driver and attendant. He was also a licensed emergency medical technician. He and his ambulance arrived at the scene shortly after the accident occurred. Moore took Lowell's blood pressure, which he found to be 300 over 140. Normal blood pressure is 150 over 80 or 90. Moore helped Lowell to the bathroom, put him in the ambulance and took his blood pressure again. It was still 300 over 140. Moore was not permitted to testify that a blood pressure reading of 300 over 140 means that a heart attack or a stroke is possible.

Plaintiff Betty Pfeffer testified that her husband was hospitalized for about a week following the collision. Before the accident, Lowell had been taking "blood pressure medicine" and had just begun taking insulin. After the accident, Lowell took nitroglycerine much more often; "He would take it to bed, he never went anywhere without it after the accident." Before the accident Lowell tended the livestock—a cow, some hogs and some steers—at home, and he helped raise a big garden. At times Lowell drove a grain truck. After the accident, Lowell was unable to work as he had before; he would often "get real gray looking" and would then take nitroglycerine. After the accident, Lowell was unable to cut firewood without assistance, although he had been able to do so before the accident. After the accident, Lowell believed he was going to die; he became anxious and irritable.

On April 6, 1982, Lowell and plaintiff Betty fixed supper together, ate, and prepared to go to bed. Lowell complained of pain and took a nitroglycerine tablet. The two retired about 8:30 p.m. Some time later, Lowell woke his wife, gasping for breath. Mrs. Pfeffer tried to obtain help and tried to administer C.P.R., but "[her husband] just went, there was no noise." No autopsy was performed.

At this point it is appropriate to note that the deposition of Dr. Lorman Hoopes, had the plaintiffs been allowed to read it to the jury, would have shown that Lowell was treated at the VA Hospital from January 14, 1982, to January 28, 1982, seven days before the accident occurred. During the time Lowell was hospitalized in January it was determined that he was suffering from uncontrolled diabetes mellitus, coronary artery disease with angina, degenerative arthritis and hypertension. On January 28, 1982, Lowell was taking Isordil, Lanoxin, a form of hydrochlorothiazide and nitroglycerine, among other medicines. By resort to scientific books of everyday use, this court may take judicial notice that Isordil is a drug administered to patients suffering from coronary-artery disease to decrease the frequency and severity of their attacks of angina pectoris; Lanoxin is a drug administered to cardiac patients to regulate

the mechanism of their heartbeat and so to decrease the strain on the heart itself; hydrochlorothiazide is a drug prescribed to control hypertension and nitroglycerine is commonly used to relieve the pain of angina pectoris by dilating the coronary arteries. So, from the trial court's point of view, it was obvious that Lowell was suffering from several life-threatening diseases a week before the accident occurred.

After the testimony of plaintiff Betty Pfeffer was received, the trial court made an announcement and ruling in chambers and out of the hearing of the jury. In part, the court's ruling was:

"Let the record reflect that one of the problems which the Court has before it is the causal relationship between the accident described in [the] evidence and the subsequent death of Lowell Pfeffer. This court has previously overruled a motion for a summary judgment on that issue. It did so because although the Court had the benefit of reading the deposition[s] of the two medical witnesses, ... the Court did not have the benefit of knowing what other evidence might be offered.... Now that the Court has heard all of the other testimony, the Court would be willing to review that ruling...."

Being satisfied that the testimony of Dr. Lorman Hoopes and Dr. Krishnaswamy Arnand represented all of the plaintiffs' expert testimony, the court then announced:

"Let the record reflect that the plaintiff offers into evidence the depositions of Dr. Arnand and Dr. Hoopes, and the Court finds that after reading the depositions of both doctors that there is a failure on the part of the plaintiff to sustain plaintiffs' burden of proving by a preponderance of the evidence that the death of Lowell was the direct and proximate result of the accident described in [the]

evidence. For that reason the depositions of the two doctors dealing with the causation will be excluded from evidence and not read to the jury. The depositions are lengthy, to read them to the jury, after having [had] the opportunity of reviewing them myself, would [not only] be time consuming, but [would] also inject a false issue in my judgment. I do not intend to preclude you from offering in evidence any testimony of these doctors that deal with any issue in this lawsuit other than the death of Lowell."

In response to a question by defendant's counsel, the court responded:

"The record shall show I am sustaining a motion for directed verdict, after these medical depositions have been offered in evidence and read by the Court."

The trial court thus made the basis of its ruling perfectly clear. The evidence, considered as a whole, did not establish a causal connection between the injury and the death of Lowell Pfeffer. Trial counsel argued at the time that he should have been permitted to read parts of the depositions in evidence. Many trial judges would have submitted the whole of the evidence to the jury and would then have directed a verdict, but we cannot fault the trial court for conducting an efficient trial. The rule is that:

" '[a] case is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Neither may any fact essential to submissibility be inferred in the absence of [a] substantial evidentiary basis.' "

*Houghton v. Atchison, Topeka & Santa Fe Railroad Co.*, 446 S.W.2d 406, 409 (Mo. banc 1969), quoting *Probst v. Seyer*, 353 S.W.2d 798, 802, 91 A.L.R.2d 1252 (Mo. 1962).[1]

---

1. The court is aware that in 1979 our Wrongful Death Act was substantially amended by the enactment of H.C.S.S.B. 368, Laws of Mo.1979, p. 630, and that § 537.021, a procedural part of the Wrongful Death Act, has been amended several times since 1977. See Comment, Missouri's

New Wrongful Death Statute—Highlights of Some Significant Changes, 45 Mo.L.Rev. 476 (1980). These statutory amendments did not alter the plaintiff's burden of proof of causation or proximate cause in wrongful death actions. The plaintiff's burden is to show that but for the

Before we consider and analyze the plaintiffs' expert testimony, we call attention to the general rules set out by our Supreme Court in *Kimmie v. Terminal R.R. Ass'n of St. Louis*, 334 Mo. 596, 66 S.W.2d 561 (1933), a leading case on the question whether expert testimony constitutes substantial evidence of causation in personal injury cases. In that case, the court held, inter alia, 1) that the opinions of experts based on examination and treatment constitute substantial evidence and the weight of their testimony is for the jury. Physicians so testifying should state what opportunity for observation they had and give the reasons for their opinions. *Id.*, 334 Mo. at 603, 66 S.W.2d at 564; 2) the opinion of an expert that an injury *might, could or would* result from [a particular cause] is no more than an assurance that such a result is scientifically possible, unless there is "... other ample evidence, 'tending to exclude all other causes save [the defendant's negligence] and to prove that [the defendant's negligence] was the cause' ...." *Id.*, 334 Mo. at 604, 66 S.W.2d at 564; 3) when there are other facts in evidence tending to show that an accident caused a certain condition, the assurance of an expert that it is scientifically possible is of some aid to the jury in determining what are reasonable inferences to be drawn from the facts. *Id.*, 334 Mo. at 605, 66 S.W.2d at 565. To much the same effect are *O'Leary v. Scullin Steel Co.*, 303 Mo. 363, 382, 260 S.W. 55, 61 (banc 1924), and *Adelsberger v. Sheehy*, 332 Mo. 954, 59 S.W.2d 644 (1933), cited by the court in the *Kimmie* case. The standard for medical opinion concerning causation is usually said to be one of reasonable medical certainty. As we understand the case law, the same standard applies if the defendant's negligence has unforeseen consequences, as when the injury is not such as would result in the death of a healthy person, but nevertheless causes or brings

about death by aggravating existing diseases. *Dorsey v. Muilenburg*, 345 S.W.2d 134, 139 (Mo.1961). More specifically, this court has held that when the decedent is a person suffering from several diseases which might cause death, and he or she succumbs some time after a relatively minor accident, it would be improper to permit the jury to infer that death was a result of the accident without the aid of expert medical testimony. *Bailey v. Kershner*, 444 S.W.2d 10, 14 (Mo.App. 1969). We adhere to that ruling in this case.

The plaintiffs in this case proposed to offer the depositions of two physicians employed at the VA Hospital at Poplar Bluff. Neither of these two physicians had examined or treated Lowell Pfeffer. Their testimony was based on hospital records. The deposition of Dr. Lorman Hoopes, chief of staff at the hospital, revealed, as we have said, that on January 28, Lowell was discharged from the hospital suffering from uncontrolled diabetes, coronary artery disease with angina, degenerative arthritis and hypertension. Upon readmission after the accident, it was determined that Lowell had sustained a cerebral concussion as a result of the accident, and still had diabetes, hypertension and degenerative arthritis of the spine. There was some contusion and abrasion about Lowell's left temple.

Dr. Hoopes was then asked if an automobile accident resulting in a cerebral concussion could cause stress in a man Lowell's age. He answered "Well, any traumatic event in any age can cause problems." Dr. Hoopes also explained that stress relates to heart disease in older persons by diminishing the function of the coronary arteries. A "post-concussion" syndrome was explained as follows:

"There is a blow. There is a possibility of an organic cause which cannot—an organic effect which cannot be demonstrated many times, but then there is

---

defendant's negligence, the decedent's death would not have occurred when it did. *James v. Sunshine Biscuits, Inc.*, 402 S.W.2d 364, 375[3] (Mo.1966). Neither do we conceive that our Supreme Court's recent decision that our

Wrongful Death Act merely supplements an existing common-law right, *O'Grady v. Brown*, 654 S.W.2d 904, 907–908 (Mo. banc 1983), has any effect on the question before this court.

also a psychological reaction of suppressed fear and anxiety over the present status of things and things in the future."

Such increased stress as a result of cerebral concussion is not uncommon and when it occurs, the individual has considerable anxiety that keeps expressing itself long past the time the actual accident happened.

Dr. Hoopes was then asked a hypothetical question which fairly incorporated Lowell's past medical history and the occurrence of the accident, and was asked whether he had an opinion which he could state with reasonable medical certainty concerning the cause of the cerebral concussion and mild neck spasm Lowell demonstrated after the accident. Dr. Hoopes answered: "It would appear that [it] is secondary to the accident." Counsel then asked another hypothetical question which related the events leading up to Lowell's death on April 6, and asked Dr. Hoopes if he could state the medical cause of Lowell's death with reasonable medical certainty. The doctor answered: "My first impression is that he died of miocardial [sic] infarction, secondary to arthritis and hypertension. Complicated also by diabetes."

Counsel then propounded a long hypothetical question to Dr. Hoopes as follows:

"Dr. Hoopes, let me include in the hypothetical and ask you to assume the facts as to his mental attitude or whether he was complaining at that time up to his death. Now, assume that immediately after Mr. Lowell Pfeffer was released from VA Hospital he went back to his home, that he did complain to his wife that he was unable to take care of the animals, the hogs, the cows, the pony, as he had done prior to the collision. Assume, Dr. Hoopes, that he [had] complained about not having transportation. He complained about the loss of his pickup truck. That he went various places trying to buy [a] suitable replacement. That he was not successful until three weeks before he died. That during this period he consumed much more Nytro-glycerine [sic] than prior to the accident. He would regularly become pale. He would lay down after trying to care for his hogs or his animals. That he complained about his physical condition to his wife. And, Dr. Hoopes, he expressed to his wife that he felt like he was not going to live long. He told her that he was going to die. He expressed concern to his wife that he wasn't going to be around to care for her or to take care of his grandson. That on occasion, other occasions, Dr. Hoopes, a friend cut firewood for him and he expressed to his wife that he was not going to be with her through the winter to enjoy the firewood, burn the firewood. Assume that before the collision he shopped with his wife. After the collision he stayed home, that he seldom expressed concern. Since the wreck he was not able to do the things he was before. And, Doctor, based upon this hypothetical as to the statements of Mr. Pfeffer, whether they were real or imagined, and also based on the initial love, the blood pressure right after the accident, and also based upon the cerebral concussion diagnosis he had and treated after the accident, and based upon his history of hypertension and heart problem found in the record, *do you have an opinion, with a reasonable medical certainty, whether the collision caused increased stress or emotional anxiety* in Mr. Lowell Pfeffer over this two month and two day period subsequent to his death?

\*   \*   \*   \*   \*   \*

A. What do you want, yes or no or do you want my explanation?

Q. Go ahead and explain.

A. Okay. Here is an individual who is undoubtedly an ill person. You know, uncontrolled diabetes requiring large amounts of insulin. Coronary artery disease requiring medicine. Other medicines were given like Isodril [sic], heart pills, Lanoxin; Hydrochlorthiazide [sic], a diuretic; Motrin, a non-steroid anti-inflammatory; and K–Lor, which goes with the diuretic. Then this person is

subjected to a severe blow, which necessitated his admission to the hospital. Cerebral concussion. *I feel that the answer has to be, yes.*

Q. Okay. Dr. Hoopes, based on the hypothetical and the evidence of stress during this period, the giving up or emotional anxiety, do you have an opinion, based upon reasonable medical certainty, whether this stress precipitated the fatal heart attack?

A. Yes.

Q. What is that opinion?

\* \* \* \* \* \*

A. You add this whole pattern together, it sets a stage for a miocardial [sic] infraction [sic]."

(Emphasis ours.)

◼ Bearing in mind that the form of the physician's answer to hypothetical questions does not deprive his statement of evidentiary value if it is otherwise clear that he is expressing his expert opinion as to the cause of a condition, *Walker v. St. Louis Public Service Co.,* 362 Mo. 648, 657, 243 S.W.2d 92, 97 (1951); *Smith v. St. Louis Public Service Co.,* 235 S.W.2d 102, 105[2–4] (Mo.App.1951), we look to this physician's cross-examination.

On cross-examination, Dr. Hoopes was asked if he had ever examined or treated Lowell Pfeffer; his answer was that he had not, nor even seen the decedent. His testimony was based on hospital records. Dr. Hoopes also explained that a Dr. Nimmagadda had treated Lowell while Lowell was a patient, and further explained that Lowell had been given "conservative treatment" after his admission following the accident. "Conservative treatment" meant treating the pain and fatigue; observing the patient and giving him something for pain. Counsel put several more specific questions to this doctor, including the following:

"Q. Doctor, you can't say that [Lowell Pfeffer] died as a result of an automobile accident, can you?

A. Not directly, no."

Further:

"Q. Doctor, Mr. Lewis used the phrase, type A personality. Can you state to a reasonable degree of medical certainty that Mr. Lowell Pfeffer was a type A personality?

A. No.

Q. Mr. Lewis used [the] phrase 'giving up.' Can you tell me with a reasonable degree of medical certainty Mr. Pfeffer had given up?

A. No.

Q. Mr. Lewis used a term 'post concussion syndrome.' Can you tell me with a reasonable degree of medical certainty that Mr. Pfeffer had post concussion syndrome?

A. No."

The questions put by plaintiffs' counsel make his trial theory clear. It was that the accident had caused Lowell Pfeffer to become moody, depressed and anxious as a result of a post-concussion syndrome; this anxiety and depression had in turn aggravated his preexisting coronary heart disease and hypertension and had eventually caused his death more than two months after the accident. However, what we have set out is sufficient to show that Dr. Hoopes could not say with reasonable medical certainty that any of counsel's postulates were true. The indirect responses given by Dr. Hoopes certainly do not indicate to this court that he was expressing any conclusions with reasonable medical certainty. Rather, the idiomatic language "I feel that the answer has to be, yes" and that "You add [the] whole pattern together, it sets the stage for a [myocardial infarction]" expresses only educated speculation, and amounts to nothing more than an assurance that the result was scientifically possible.

It is unnecessary to elaborate upon and compare the cases cited to us by plaintiffs' counsel. In *Walker v. St. Louis Public Service Co.,* 362 Mo. 648, 243 S.W.2d 92; *Dorsey v. Muilenburg,* 345 S.W.2d 134 and *Ficken v. Hopkins,* 389 S.W.2d 193 (Mo. 1965), there was some positive testimony by a physician who had seen and treated

the plaintiff establishing that but for the accident, the injury would not have resulted. We have no such proof here in Dr. Hoopes deposition, nor is the other deposition more illuminating.

Determining the sufficiency of proof by comparison to other precedents is one method of analysis, but it is not the only one. The essential question on appeal in the wrongful death claim is whether the proof of causation is legally sufficient. We have set out the standards of certainty laid down many years ago in the *Kimmie* case, and the proof in this case meets none of them. There is no evidence based upon examination and treatment of the decedent. The opinions of the physicians deposed by the plaintiffs amount to assurances that Lowell Pfeffer's death could or might have been hastened by the accident, but there is no accompanying evidence tending to exclude all other causes save the accident and tending to prove that the accident was the cause of Lowell's death. Such being the case, the assurances of the two physicians that the accident could or might have hastened Lowell's death were properly excluded. We find no prejudicial error in the trial court's direction of a verdict or in its refusal to receive the depositions of Dr. Hoopes and Dr. Arnand in the wrongful death action.

Having directed a verdict in the wrongful death action, the trial court again made an announcement, this time in open court. In material part, that announcement or statement was as follows:

"Ladies and gentlemen of the jury, at the commencement of [the] case you were told that there were three issues in this lawsuit. One was the personal injuries received by Mrs. Betty Pfeffer, and the damage[s] to the automobile, Number One. Number Two, the death of Lowell Pfeffer; and Number Three, the personal injuries as an alternative, the personal injuries received by Mr. Pfeffer and experienced by him with the accompanying pain and other injuries for the period of time he lived. This Court has now ruled that there is not sufficient evidence in this record for this jury to consider the accident as the cause of the death of Lowell Pfeffer. That eliminates one of the issues. There [are] still before this jury two issues. The personal injuries of Mrs. Pfeffer and the claim for damage to the automobile, and the personal injuries of Mr. Pfeffer and the pain and other injuries and damages he received for the period of time that he lived. The defendant has stipulated and agreed that any injuries you find Mr. Pfeffer received in the accident, except death, [were] directly caused by the accident, and that included his blood pressure being 300 over 140.... Does that satisfy both the plaintiff and the defendant as far as what was agreed to, have I accurately stated it to the jury? Mr. Lewis?

MR. LEWIS: Your Honor, I believe that reflects the defendant's stipulation."

At this point, the jury had already heard evidence from several witnesses concerning Lowell Pfeffer's injuries, some testimony by deposition and some directly from Trooper Lowell E. Cox, a highway patrolman who had assisted in the investigation of the accident. Plaintiff Betty Pfeffer had testified concerning the injuries she received, and the plaintiffs thereafter offered parts of the deposition of Dr. Roy Dement, a physician who treated plaintiff Betty Pfeffer after the accident.

Plaintiff Betty Pfeffer sustained a severe injury to her right ear; Dr. Dement described the injury as a "virtual complete transection of the right ear"; Mrs. Pfeffer stated that her right ear had been "cut off." She also cut her chin, bruised her left knee and apparently bruised her chest. At trial time, Mrs. Pfeffer was still complaining of numbness at the point where her ear had been sutured, and on occasion she felt dizziness and a "dull, throbbing pain" when she lay on the back of her head. Dr. Dement's testimony did not permit the inference that plaintiff Betty Pfeffer sustained any serious permanent injuries; a number of sophisticated tests were performed, including a CAT scan, which

disclosed no permanent nerve or cerebral damage. Dr. Dement did testify that "I assume with a reasonable degree of certainty that the abnormal sensations Mrs. Pfeffer is having are in some form or fashion related to the injury to the external ear." There was also evidence that the Pfeffer pickup was badly damaged and Lowell Pfeffer was obliged to buy another.

The issues remaining—plaintiff Betty Pfeffer's claim for personal injuries, her claim as personal representative of the estate of Lowell Pfeffer for non-fatal personal injuries sustained by Lowell Pfeffer, and the claim for property damage—were submitted to the jury upon defendant's failure to yield the right-of-way to the Pfeffer vehicle. The jury found the issues for the defendant and against the plaintiff.

In connection with the trial of the non-death claim, the plaintiffs argue that the trial court improperly excluded the testimony of two ambulance attendants concerning the nature and significance of injuries sustained by Lowell Pfeffer. Plaintiffs had the testimony of Donald Gene Moore, an emergency medical technician, that Lowell Pfeffer's blood pressure was 300/140 immediately after the accident. Plaintiffs sought to have Moore testify that such abnormally high reading signified "a stroke or possible heart attack." The trial court held that Moore was not qualified to give such an opinion, and refused to receive his medical conclusions. The court also refused to receive other medical conclusions which Moore and his wife, an emergency medical technician, drew from their observation of Lowell Pfeffer at the scene of the accident. Plaintiffs now argue that Mr. Moore and his wife were fully qualified to state their medical conclusions, and that the exclusion of their opinions was error.

■ The qualification of a witness as an expert in the field concerning which his testimony is sought is a matter addressed to the discretion of the trial court. *Yocum v. Kansas City Public Service Company*, 349 S.W.2d 860, 864[1] (Mo.1961); *Rowe v. Moss*, 656 S.W.2d 318, 323[11] (Mo.App. 1983). When medical opinion is involved,

this is true even if the witness is a practicing physician. *Tharp v. Oberhellmann*, 527 S.W.2d 376, 379 (Mo.App.1975). The trial court's ruling will not be disturbed in the absence of a showing of an abuse of discretion. Neither Mr. Moore nor his wife demonstrated any expertise in the field of cardiology or in any particular medical field, and the trial court's exclusion of their opinions was not an abuse of discretion.

■ The plaintiffs further argue that the trial court erred to their prejudice in refusing to receive parts of the depositions of Dr. Hoopes and Dr. Arnand. Dr. Hoopes, at least, testified on deposition concerning the cerebral concussion which Lowell Pfeffer apparently received in the automobile accident. Undoubtedly, the injury was painful and temporarily disorienting. We have the view that the trial court might have allowed plaintiffs to use parts of the Hoopes and Arnand depositions, simply to show the nature and extent of Lowell Pfeffer's injuries. Certainly any injury received by a 58-year-old man suffering from uncontrolled diabetes, advanced heart disease and high blood pressure would be of greater consequence than the same injury inflicted on a plaintiff who was in good health. And, as a practical matter, counsel had no other evidence available to prove the nature and extent of Lowell's injuries.

Nevertheless, we cannot hold the trial court to prejudicial error. The evidence excluded went only to the issue of damages. We are obliged to hold that because the jury found for the defendant on the issue of liability, it did not reach the issue of damages. *Mead v. Grass*, 461 S.W.2d 708, 709 (Mo.1971); *Gardner v. McGee*, 505 S.W.2d 452, 453 (Mo.App.1974); *Jensen v. Walker*, 496 S.W.2d 317, 320[2] (Mo.App. 1973). There was, therefore, no prejudice to the plaintiffs even if the evidence excluded might properly have been received. *Jensen v. Walker*, 496 S.W.2d at 320[2].

A further assignment of error is that the court erroneously refused to receive plaintiffs' exhibit 16, a photograph depicting the intersection of Highway 62 and Eight Ditch Road, as one approaches from the north on

Eight Ditch Road. Counsel was unwilling or unable to show when the photograph was made, or by whom. One of the investigating officers testified that exhibit 16 depicted the intersection, but he could not say it fairly and accurately depicted that intersection at the time the accident occurred. The trial court refused to admit the exhibit.

 Our courts have been extremely liberal in admitting photographs, even those made long after an accident, provided the changes in the appearance of the object depicted are explained and when so explained, the photographs reasonably may aid the jury in arriving at an understanding of facts having a direct bearing on the issues. *Davis v. Illinois Terminal Railroad Company,* 307 S.W.2d 395, 400[3] (Mo.1957); *Rust & Martin, Inc. v. Ashby,* 671 S.W.2d 4, 8 (Mo.App.1984). However, photographs should not be admitted unless they are a true and faithful representation of the subject, place or condition they purport to represent. *Bellistri v. City of St. Louis,* 671 S.W.2d 405, 407 (Mo.App.1984). Our reading of the transcript convinces us that the photograph was not really necessary to an understanding of the fact issues presented. Moreover, the trial court seems to have been of the opinion that the photograph might have misled the jury. The rejection of exhibit 16 is not a matter of sufficient gravity to convince us that prejudicial error was committed.

Finally, and at length, counsel for plaintiffs makes several assignments of error directed to the closing argument of counsel for the defendant. The plaintiffs assert, in fact, that ten prejudicial errors are traceable to the defendant's final argument. The assignments of error have been considered, but no useful purpose would be served by discussing them at length. The determination of the prejudicial effect of final argument is a matter within the discretion of the trial court and that discretion will not be disturbed unless an abuse of discretion appears. *Handshy v. Nolte Petroleum Company,* 421 S.W.2d 198, 202[7, 8] (Mo.1967); *Hart v. Forbes,* 633 S.W.2d 90, 92 (Mo.App.1982). We find no such abuse of discretion.

We find no error in any respect briefed or argued here, and accordingly, the judgment is affirmed.

TITUS and MAUS, JJ., concur.

CROW, P.J., disqualified.