**Dixie Boyd CARTER, Respondent,**

v.

**JONES TRUCK LINES, INC., Appellant.**

No. 21275.

Missouri Court of Appeals,
Southern District,
Division Two.

April 1, 1997.

Motion for Rehearing and Transfer to Supreme Court Denied April 23, 1997.

Application to Transfer Denied
May 27, 1997.

Daniel E. Scott, Copeland & Scott, L.R. Buehner, Jr., Buehner & Buehner, Joplin, for appellant.

Glenn R. Gulick, Jr., Hershewe & Gulick, P.C., Joplin, for respondent.

CROW, Presiding Judge.

Jones Truck Lines, Inc. ("Employer") appeals from an award by the Labor and Industrial Relations Commission ("Commission") granting benefits under The Workers' Compensation Law, chapter 287, RSMo 1986, as amended, to Dixie Boyd Carter ("Claimant") as sole dependent of Vern Boyd ("Employee").

Employee died February 2, 1989, on Employer's premises. Claimant is Employee's widow.[1]

Commission's award incorporated by reference an award by an Administrative Law Judge ("ALJ") of the Division of Workers'

Compensation wherein the ALJ found Employee's death was caused by a ventricular fibrillation ("V-fib") that occurred while he was performing duties within the course and scope of his employment.

Employer's sole point relied on is:

"The Commission erred in finding that the employee's death arose out of his employment, in that there was no substantial evidence in the record that the employee's fatal V-fib was job-related within the rule of *Wynn v. Navajo Freight Lines*,[2] because claimant's sole causation witness failed to establish that the V-fib's 'actual triggering cause' was induced by or related to the employee's job or work."

The "sole causation witness" referred to in Employer's point is Francis H. Corcoran, a medical doctor. He is "board certified" in internal medicine and cardiovascular diseases. We shall examine his testimony after recounting Employee's activities on the day he died.

The ALJ made comprehensive findings regarding Employee's activities. Inasmuch as Commission incorporated those findings in its award and Employer does not challenge those findings, we glean many of the facts in our narrative from those findings.

Employee, age 55, arrived at Employer's premises at 5:30 a.m. The weather was cold; it got colder during the day. At 6:00 a.m., the temperature was 25 degrees Fahrenheit and the wind chill was 14. By noon, the wind chill had dropped to zero; at 4:00 p.m. the wind chill was five degrees below zero.

Upon arrival at Employer's premises, Employee moved freight trailers to various dock locations. In doing this, Employee connected a tractor to a trailer, a procedure performed outside. The chore involved securing the "fifth wheel," hooking up an air hose, and "cranking the dollies up." The latter task,

---

1. Commission found Claimant married George William Carter on January 23, 1995, almost six years after Employee died. That is evidently why Claimant's surname appears as "Carter" on Commission's award.

2. *Wynn v. Navajo Freight Lines, Inc.,* 654 S.W.2d 87 (Mo. banc 1983).

done by hand, was strenuous in cold weather because the grease in the gears became gluey.

After connection, Employee drove the unit to the proper location and backed the trailer to the dock. Then, Employee exited the tractor and disconnected the trailer, which involved hand-cranking the dolly back down.

Once the trailers were situated, Employee's next assignment was to prepare to deliver freight himself on a local route. He loaded a trailer with cargo destined for six sites, then departed Employer's premises pulling the trailer with a tractor.

Employee reached his first destination at 11:21 a.m., and completed his sixth (and final) delivery at 2:15 p.m. He then contacted his dispatcher and was told to return to Employer's premises. According to the dispatcher, Employee "[s]ounded fine."

Employee arrived at Employer's premises about 3:30 p.m., exited the tractor, walked to his personal vehicle, and started its engine.[3] He then returned to the tractor-trailer unit and drove it to the terminal area.

Some time later, a fellow worker was checking trailers on the lot. As he went past a tractor-trailer unit at the dock, he heard something "running" inside the tractor cab. He opened the door and found Employee lying on his right side. Employee showed no sign of life.

The worker noted the ignition was on, but the tractor's engine was not running. The noise that had attracted his attention was the heater motor. The worker surmised that as Employee was backing the unit toward the dock, the trailer bumped against it and Employee's foot slipped off the clutch, killing the engine.

A firefighter captain was summoned from a nearby station at 4:59 p.m. He rushed to the tractor and examined Employee. According to the captain, Employee was "obvi-

ously deceased." Employee was cold, his lips were dark, he had no carotid pulse, and "blood was pooled around his midsection."

Jerry Neil, an "assistant coroner," arrived and found vomitus in Employee's mouth. Neil prepared a report showing the cause of death as "apparent heart attack." Neil ordered no autopsy, as there was no indication of foul play.

Expert testimony about the cause of Employee's death came from two witnesses. One was Dr. Corcoran, introduced earlier. The other was a physician—board certified in cardiology and internal medicine—engaged by Employer's counsel to review information about Employee's death and render an opinion as to the cause.

The ALJ found the testimony of Employer's expert "entitled to no weight or credibility." Inasmuch as Commission incorporated the ALJ's findings in its award, Employer does not, in this appeal, argue that its expert was more persuasive than Corcoran. Employer concedes it was Commission's prerogative to give no weight to the testimony of Employer's expert. *Haynes v. Emerson Electric Co.*, 799 S.W.2d 939, 947 (Mo.App. S.D.1990). Consequently, we say nothing more about Employer's expert.

The ALJ's findings (incorporated by Commission) include these:

"I find the more credible evidence leads me to conclude the ventricular fibrillation causing [Employee's] death was brought about by [his] working conditions, coupled with his personal risk factors, and that he was performing duties within the course and scope of his employment for [Employer] at the time of his demise. . . .

The most credible medical evidence leads me to conclude that [Employee], carrying with him a family history and several risk factors predisposing him to heart disease, was engaged on February 2, 1989, in activities throughout the day in extreme

---

**3.** Claimant testified it was Employee's habit to start his vehicle on cold days before going off duty.

cold, coupled with moderate physical labor while making his deliveries. I find of no legal consequence the fact that [Employee], upon arriving at [Employer's] terminal, stopped in the employee parking lot and started his personal vehicle to warm it up in the cold weather, as was the custom of [Employee].... Dr. Corcoran, in his testimony, indicated a causal connection between not only the [Employee's] predisposed condition to heart disease, and that coupled with the extremes in cold which [Employee] was working in throughout the day engaged in the physical activities that he was, were, within Dr. Corcoran's reasonable medical opinions, the cause of the fatal ventricular fibrillation which brought about [Employee's] death, and that [Employee] was in the process of backing his tractor with trailer attached up to the employer's terminal at the time this fatal event took place."

In determining whether Corcoran's testimony was sufficient to support Commission's award, we begin with *Wynn v. Navajo Freight Lines, Inc.*[4] There, Commission awarded death benefits to the widow and unemancipated children of a truck driver who suffered a fatal heart attack while driving his usual route. On appeal, the Supreme Court of Missouri stated:

"The issue in this case is whether an employee's death by work induced heart attack during the continued performance of his usual duties constitutes ground for worker's [sic] compensation death benefits."

654 S.W.2d at 87–88.

Affirming the award, the Supreme Court noted that judicial construction of the statutory definition of "accident" had been broadened in *Wolfgeher v. Wagner Cartage Service, Inc.*, 646 S.W.2d 781 (Mo. banc 1983). *Wynn*, 654 S.W.2d at 89. The opinion in *Wynn* quoted the following passage from *Wolfgeher*, 646 S.W.2d at 784:

"Where the performance of the usual and customary duties of an employee leads to

physical breakdown or a change in pathology, the injury is compensable."

*Wynn*, 654 S.W.2d at 89.

The opinion in *Wynn* declared that under *Wolfgeher*, a work related heart attack during the course of one's employment is compensable even though unaccompanied by unusual or abnormal strain. *Wynn*, 654 S.W.2d at 89. *Wynn* explained:

"Even though [the employee] was in poor health, had a preexisting heart condition, did not take good care of himself, and might have succumbed to a fatal heart attack while off work, possibly caused by different sorts of stress, the right to compensation should exist if the actual triggering causes are found, on the basis of substantial evidence, to meet the 'job related' or 'work related' test of *Wolfgeher*."

*Wynn*, 654 S.W.2d at 89–90.

Obviously relying on the above passage, Employer's point relied on, quoted earlier, avers Corcoran's testimony failed to establish that the actual triggering cause of the V-fib was job related or work related. Citing *Haynes*, 799 S.W.2d at 947, Employer argues: "Unless the employee's job performance induced the heart attack, even a workplace heart attack is not compensable."

Claimant maintains Corcoran's testimony amply demonstrated "that the actual triggering causes of [Employee's] fatal heart attack were work-related, i.e., the performance of the usual and customary duties of his job."

Corcoran's testimony occupies seventy pages in the transcript. We begin our study of it by noting the segments favorable to Commission's award.

Corcoran saw Employee October 4, 1984 (52 months before Employee died), because Employee was having chest pain and irregularities in his heart rhythm. Employee had risk factors for development of coronary disease including a family history of it, elevated cholesterol, and smoking.

4. Footnote 1, *supra.*

An arteriogram revealed Employee had only "minimal irregularities in the arteries." An electrocardiogram showed he had premature ventricular beats—heartbeats "that occur out of the normal sequence."

If premature ventricular beats become so severe that the electrical activity which stimulates the ventricle becomes "a continuous thing," the ventricle stops contracting because it is being "bombarded with these impulses going in all directions." This condition is ventricular fibrillation, a type of cardiac arrhythmia. It causes unconsciousness in five to ten seconds and is lethal if not corrected within four minutes.

Physical activity in a person predisposed to heart disease can cause V-fib. Additionally, exposure to cold constricts the small blood vessels near the skin surface, a mechanism to conserve body heat. This raises the resistance to blood flow, increasing the work load on the ventricle.

Claimant's lawyer asked Corcoran a question hypothesizing the work Employee performed on the fatal day, the weather conditions, and the circumstances in which he was found dead. The question inquired whether Corcoran had "an opinion with reasonable medical certainty as to whether or not [Employee] suffered a sudden death due to ventricular fibrillations."

Corcoran answered, "I think almost certainly that's what was the cause of death, the immediate cause of death was ventricular fibrillation." His testimony continued:

"Q. And do you have an opinion with reasonable medical certainty as whether or not his job duties, doing the physical labor in this cold weather, caused or contributed to cause the V-fib from which he died of?

A. I think that there's with reasonable medical certainty a high likelihood that this may have contributed—this did contribute to his cardiac—fatal cardiac arrhythmia."

For ease of discussion, we hereafter refer to the above dialogue as "Answer One." Corcoran's testimony continued:

"Q. Why do you say that?

A. Because basically you have a man who is predisposed to coronary disease, we know he had some mild changes five years earlier.... [A]therosclerosis is a progressive disease and certainly there's a significant likelihood that he would have some progression of the disease. And even with mild disease, you lose the ability of the arteries to dilate as well as they used to. And the other additional factor he had was this underlying ventricular irritability.... And there is a higher incidence of ventricular fibrillation in people with chronic ventricular ectopy whether they have atherosclerosis or not.... So I think that ... certainly the strenuous activity and the cold very well could have been triggering events in someone who just likely to develop ischemia with that kind of stress.

Q. And that's your opinion with reasonable medical certainty?

A. With reasonable medical certainty. Yeah...."

We hereafter refer to the above dialogue as "Answer Two." Corcoran further testified:

"Q. And with that background, that type of stress, just his normal job duties in this cold environment is enough to cause this fatal V-fib?

A. I believe so."

We hereafter refer to the above dialogue as "Answer Three."

Employer insists there are two reasons why Corcoran's testimony was insufficient to support a finding that the actual triggering cause of the V-fib was job related or work related.

Employer's first reason is that Corcoran never said it was his opinion "to a reasonable medical certainty" that Employee's work caused the V-fib. Employer cites three cases for the proposition that Corcoran's testimony

was, for that reason, "neither substantial evidence nor sufficient to make a submissible case." We discuss those cases in the next three paragraphs.

In *Shackelford v. West Central Electric Cooperative, Inc.,* 674 S.W.2d 58, 62[3] (Mo. App. W.D.1984), the court declared that the opinion of an expert witness regarding the cause of a condition or event is of no probative value if couched in terms of "might or could." The court further held that testimony by an expert witness that an act or omission was a possible factor or was extremely likely to have had a causal effect is likewise insufficient to make a submissible case. *Id.* at 62.

In *Wiedmaier v. Robert A. McNeil Corp.,* 718 S.W.2d 174 (Mo.App. W.D.1986), the court affirmed Commission's denial of workers' compensation benefits to a laborer who claimed his heart attack was work related. The court explained that the testimony of a medical expert that a physical condition "might" or "could" have been caused by a prior event is, absent other evidence of causation, insufficient to support a finding that the event did cause the condition. *Id.* at 176–77. That is because such an opinion "rests upon speculation, surmise and conjecture." *Id.* at 177[1].

In *Pfeffer v. Kerr,* 693 S.W.2d 296, 302[2] (Mo.App. S.D.1985), this court acknowledged that the form of a physician's answer to a hypothetical question does not deprive his statement of evidentiary value if it is otherwise clear that he is expressing his expert opinion as to the cause of a condition. However, where the physician's responses do not indicate he is expressing any conclusions with reasonable medical certainty, his testimony is insufficient to support a finding that a particular event caused the ailments in issue. *Id.* at 302. Such testimony expresses only educated speculation, and amounts to nothing more than an assurance that the result was scientifically possible. *Id.*

Our independent research led us to *Lemm v. Gould,* 425 S.W.2d 190 (Mo.1968). There, a medical expert gave his opinion based on reasonable medical certainty that the plaintiff's ailments were a result of the event in issue. *Id.* at 200[10]. The court held the testimony sufficient for a submissible case. *Id.*

In a later case, *Holmes v. Gamewell,* 712 S.W.2d 34, 37[7] (Mo.App. E.D.1986), an accident victim relied on the diagnosis of his treating physician in a suit for injuries allegedly sustained in the accident. The court held:

"Nowhere did the doctor attempt to indicate his opinion that the ... accident had caused plaintiff's injuries with a reasonable degree of medical certainty and so is insufficient as expert medical testimony."

■ In *Pfeffer,* discussed earlier, this court said: "The standard for medical opinion concerning causation is usually said to be one of reasonable medical certainty." 693 S.W.2d at 300. That is consistent with *Lemm* and *Holmes,* discussed in the two preceding paragraphs. Accordingly, we hold Claimant was required to present expert opinion that, to a reasonable medical certainty, the actual triggering cause of the V-fib was job related or work related. *Wynn,* 654 S.W.2d at 89–90.

Having decided that, it is obvious our next task is to determine whether Corcoran's testimony, viewed favorably to Commission's award, *Davis v. Research Medical Center,* 903 S.W.2d 557, 565[3] (Mo.App. W.D.1995), met that standard.

■ In Answer One, Corcoran testified with reasonable medical certainty that there was a *high likelihood* that Employee's physical labor in the cold weather did contribute to the V-fib. Absent the qualifying phrase "high likelihood," Corcoran's testimony would have arguably met the "reasonable medical certainty" standard. However, an opinion (even one based on reasonable medical certainty) that there is a high likelihood that Employee's physical labor in the cold weather contributed to the V-fib falls short of an opinion, based on reasonable medical certainty, that Employee's physical labor in the cold

weather *was* an actual triggering cause of the V-fib.

■ In Answer Two, Corcoran testified with reasonable medical certainty that Employee's strenuous activity and the cold weather "very well could have been triggering events" of the V-fib. However, such an opinion falls short of an opinion, based on reasonable medical certainty, that Employee's strenuous activity in the cold weather *was* an actual triggering cause of the V-fib.

■ In Answer Three, Corcoran testified he believed that with Employee's background (inferably his history of chest pain), his normal job duties in the cold environment was enough to cause the V-fib. Again, this falls short of an opinion, based on reasonable medical certainty, that Employee's job duties in the cold environment *was* an actual triggering cause of the V-fib.

In sum, we hold Answer One, Answer Two and Answer Three, separately or in the aggregate, do not constitute an opinion, based on reasonable medical certainty, that the actual triggering cause of the V-fib was job related or work related.

In reaching that conclusion, we do not exalt form over substance or decide the case on semantics. The reasonable medical certainty standard is firmly established and simple. A medical expert either does, or does not, have an opinion, based on reasonable medical certainty, that a physical condition or ailment was caused by a particular event or specific circumstances. If the expert has such an opinion, presenting it under oath should not be difficult.

We do not ignore the workers' compensation heart attack cases cited by Claimant where awards were affirmed. In *McCowan v. City of Riverside*, 890 S.W.2d 725, 726 (Mo.App. W.D.1995), the widow's medical expert testified that the event in question created stress which, to a reasonable degree of medical certainty, was a contributing factor to the worker's death. In *Ham v. Sikeston Concrete Products*, 735 S.W.2d 427, 428–29

(Mo.App. S.D.1987), the widow's medical expert was certain that the worker's physical activity on the job, which preceded the heart attack, was a significant factor in triggering or precipitating the attack. In *Foley v. Pipefitters Union, Local 562*, 762 S.W.2d 870, 871 (Mo.App. E.D.1989), the claimants' medical expert testified that within a reasonable degree of medical certainty the weather conditions and the worker's physical exertion in the course of his employment directly contributed to his fatal heart attack. The difference between the expert testimony in those cases and Corcoran's testimony in the instant case is obvious.

We likewise do not ignore *Johnson v. City of Duenweg Fire Dept.*, 735 S.W.2d 364 (Mo. banc 1987), where an award of workers' compensation benefits was upheld despite the inability of the widow's medical expert to conclude with reasonable medical certainty that the worker—a volunteer firefighter—had a heart attack on the day in question. *Id.* at 366. However, the court noted the existence of lay testimony which, combined with the medical evidence, supported the award. *Id.* at 367. The court emphasized that prior to the incident in dispute, the firefighter had not complained of pain in his chest or arms, that on the day in question, while on duty at a fire, he experienced intense pain in his chest and arms for an hour and a half, and that he continued to experience tiredness and additional pain until a subsequent heart attack nine days later. *Id.* at 365, 367. The court held Commission reasonably concluded that the firefighter's preexisting heart condition was activated by the unusual exertion on the job. *Id.* at 367.

Here, the evidence was otherwise. Corcoran testified:

"Q. ... is it the lack of oxygen that sets up the electrical event that causes the fibrillation?

A. That's what I'm postulating.... And lack of oxygen can either be inadequate supply or excessive demand.

Q. And until that happens, he's all right?

A. That's correct.

Q. And there's no cumulative effect of it, is there?

A. No.

. . . .

Q. ... he hadn't had a fibrillation [as of the time he finished his last delivery], we can be sure of that at that point?

A. We can be sure of that.

. . . .

Q. Are you aware of the fact that he called in to the dispatcher and had a conversation with him before he came back to the terminal?

A. I believe that was while he was still at [his last delivery site] and told to come on in.

Q. And still no complaint?

A. No complaints at that time, yes.

Q. Would that be good evidence to you that he was not then fibrillating?

A. Not at that particular time.

Q. And would that be good evidence to you, then, that his oxygen supply was ample?

A. At that particular moment.

. . . .

Q. Doctor, it's your opinion that [Employee] did not have his V-fib while sitting in his [personal vehicle] or starting [it], is it not?

. . . .

A. I think certainly we can say that or he would have never made it out of his personal [vehicle].

Q. And if he had actually had a V-fib, he would never have got to his Jones truck, is that true?

A. Ventricular fibrillation will incapacitate him in a matter of five to ten seconds, he'll be unconscious.

Q. Is it your opinion that his V-fib started while he was in his Jones truck?

A. It would be my opinion with great medical certainty that it occurred while he was sitting in his Jones truck.

Q. Doctor, it is your opinion that it is the stress of his work throughout the day in this cold environment that set up the V-fib, is it not?

A. I would like to say that—I wouldn't say it was so much of a cumulative thing as each one of these stressful— you know, increasing stresses sets up the conditions for ventricular fibrillation, and it's just happenstance as to when that might actually occur. It's kind of a random event, he's probably firing off these ectopic beats and you would have to have one hit right in that vulnerable period to actually precipitate the ventricular tachycardia and ventricular fibrillation.

Q. But in your opinion he had sufficient of those stressors that day with work and cold environment to set up that fatal event?

. . . .

A. He had multiple stressful situations, any one of which could cause the fatal event. But I don't view them as additive."

It is evident from the preceding testimony that Corcoran believed the V-fib occurred after 3:30, while Employee was backing the tractor-trailer unit to the dock, a non-strenuous task. Despite the effort of Claimant's lawyer to elicit testimony from Corcoran that Employee's job activities earlier that day, outside in the cold weather, were a triggering cause of the V-fib, Corcoran never confirmed that theory with reasonable medical certainty.

■ Claimant's brief points out that her medical evidence did not consist solely of Corcoran's testimony. Claimant directs us to a report of Employee's family doctor, Jack Vinyard, dated October 8, 1992 (44 months after Employee died). The report states: "Patient doing physical work in cold weather caused his fatal ventricular arrhythmia." Claimant argues that Employer ignores Vinyard's opinion.

Employer responds that Vinyard's report was received in evidence by the ALJ over

Employer's objection that it was not part of Vinyard's records and was based on hearsay. Consequently, says Employer, Vinyard's report is not substantial evidence and cannot support Commission's award.

We agree. Vinyard's report was inadmissible, *Lane v. Schreiber Foods, Inc.*, 903 S.W.2d 616, 621–22 (Mo.App. S.D.1995), hence it could not be properly considered by Commission. Furthermore, as emphasized by Employer, nothing in the record indicates Commission considered the report in reaching its decision. The report is unmentioned in Commission's award and is likewise unmentioned in the ALJ's findings, incorporated in Commission's award.

For the hitherto reasons, we hold there was no substantial evidence to support a finding that the actual triggering cause of Employee's V-fib was work related or job related, an essential element of the claim.[5] *Wynn*, 654 S.W.2d at 89–90.

The award of Commission is reversed.

PARRISH, J., and MONTGOMERY, C.J., concur.

Glennon Sweet, Mineral Point, pro se.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Andrew Lay, Asst. Atty. Gen., St. Louis, for defendant/respondent.

Before CRANE, P.J., and GERALD M. SMITH and PUDLOWSKI, JJ.

---

5. This holding makes it unnecessary to consider the second reason tendered by Employer in support of its premise that Corcoran's testimony was insufficient to support Commission's award.