**Rollan WAGNER (Deceased) by his Dependent, Emma J. WAGNER–JONES, Appellant,**

v.

**HARBERT YEARGIN CONSTRUCTION CO., and Liberty Mutual Insurance Co., Respondents.**

No. 26152.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 6, 2004.

Jerry Kenter, Boyd & Kenter, P.C., Kansas City, MO, for appellant.

John F. Sander, Valentine & Rouse, St. Louis, MO, for respondents.

JAMES K. PREWITT, Judge.

Emma J. Wagner–Jones ("Wife"), wife of decedent Rollan Wagner ("Employee"), appeals a decision of the Labor and Industrial Relations Commission ("the Commission") denying compensation under the Missouri Workers' Compensation Act related to the death of Employee. With one point relied on, Wife contends that the Commission erred in ruling that Employee did not sustain an accident arising out of or in the course of his employment because the "found dead" presumption was applicable and not rebutted.

■ We will affirm the decision of the Commission if, after an examination of the record as a whole, we determine there was sufficient competent and substantial evidence to support the workers' compensation award. *Kerns v. Midwest Conveyor*, 126 S.W.3d 445, 450 (Mo.App.2004). That standard is not met if the award is contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo.banc 2003).

■ Where, as here, the Commission incorporates the award and decision of the administrative law judge ("ALJ"), this Court considers the findings and conclusions of the Commission as including the ALJ's award. *Kauffman v. Tri–State Motor Transit Co.*, 28 S.W.3d 369, 370 (Mo. App.2000). We independently review any findings and awards of the Commission that clearly involve the interpretation or application of the law. *Id.* Review of questions of fact is limited to a determination of whether the Commission could have reasonably reached the result that it did. *Decker v. Nat. Accounts Payable Auditors*, 993 S.W.2d 518, 523 (Mo.App.1999), *overruled in part on other grounds by Hampton*, 121 S.W.3d at 227. On issues involving the credibility of witnesses and the proper weight to be given their testimony, we defer to the Commission. 993 S.W.2d at 523. This deference is therefore accorded if the Commission is asked to choose between conflicting medical opinions. *Decker v. Square D Co.*, 974 S.W.2d 667, 670 (Mo.App.1998).

Employee was employed by Harbert Yeargin Construction Company as a carpenter. Employee worked on-site at Ford Leonard Wood ("FLW"). On January 16, 1997, Employee was assigned a job of replacing a portion of the formica edging on a beverage counter in a mess hall at FLW.

Although someone may have heard Employee fall, no one saw him fall and he was found on the floor in the mess hall near the beverage counter, lying on his back. Mark Presley ("EMT"), an emergency medical technician, was the first to administer aid to Employee, who was unconscious, had no pulse, and was not breathing. EMT, ambulance personnel, and emergency room nurses and physicians all attempted to revive Employee; however, he was pronounced dead at the FLW Army hospital.

According to the Missouri certificate of death, Employee died of natural causes, with the cause of death listed as cardiac arrest. Possible sudden cardiac death and possible acute MI (myocardial infarction) were listed as antecedent causes of death. No autopsy was preformed.

Nearly three years prior to the incident, in July 1994, Employee saw Dr. Randal Trecha, a physician with the Columbia Orthopaedic Group, for low back and right leg pain. Employee returned for follow-up appointments in July and August of 1994, and on August 26, 1994, "claimed he had a syncopal [fainting] episode [that] morning and his heart rate was thought to be irregular at approximately 36." On the medical history completed by Employee for his first visit with Dr. Trecha, Employee noted

"that his father had died at a young age from heart problems." According to Wife, Employee's brother and sister also died from heart-related problems.

An appointment was made for Employee for a cardiology evaluation; however, Employee cancelled the appointment, after which Dr. Trecha sent Employee a letter in which he told Employee, "I am concerned that you have an irregular heart beat that may cause you to suffer a stroke, heart attack or even sudden death." Dr. Trecha strongly advised Employee to "seek cardiology evaluation and treatment for [the] problem[.]" Dr. Trecha also stated in the letter, "It is important you understand that this may be a life threatening condition if not appropriately treated soon."

According to Wife, Employee never went to the "heart doctor" and "laughed at what Dr. Trecha told him." Another reason for Employee's refusal to see a cardiologist was that he thought "they just wanted another buck."

For at least a year prior to his death, Wife thought Employee looked tired, and for six months prior to his death, he complained of arm pain. The day before he died, Employee complained of feeling uncomfortable in his chest area, back of his head, and both of his arms. The night before his death, Employee tried to wrap his upper arms in Saran Wrap due to the pain and discomfort.

On the morning of his death, January 16, 1997, Employee, according to Wife, "prayed aloud for the lord to give [Employee] strength and wisdom to survive." Wife testified that she wanted Employee to see a doctor on that day, telling him that she would call to make an appointment. Employee informed her that doctors' offices were closed that day, after which Wife offered to take him to the emergency room before he went to work.

Dr. Trecha's previous warnings to Employee had "a lot to do with" Wife's concern that morning and her offer to take him to the emergency room. Employee refused her offer and went to work.

EMT saw Employee sometime between 8:00 and 8:30 a.m. that morning at fire station one at FLW. Employee had stopped by the fire station to apply for a "hot work permit," which allows a worker to use a torch or do electrical welding inside of a building. They talked for ten to fifteen minutes, and were "cutting up and joking" about the bitterly cold weather that day. According to EMT, there was no "indication that [Employee] was in ill health or pain or feeling bad[.]"

Later that morning, while driving a brush truck, a smaller version of a fire truck that has no emergency medical or life support equipment on it, EMT was approached by a Harbert Yeargin vehicle and told that a call had just been received that one of their employees was down in a building. As he was only three or four blocks away from that building, EMT decided to respond. When EMT arrived on the scene, an ambulance from fire station two was being dispatched.

EMT was the first emergency personnel at the scene, and someone directed him to the drink line in the mess hall, which is where EMT found Employee lying "[f]lat on his back in a pool of blood approximately ten inches in diameter .... around his head and shoulders." EMT speculated that the blood was coming from the back of Employee's head; someone other than EMT had placed bundles of napkins next to Employee's head either to absorb the blood or in an attempt to keep Employee's head still.

While checking for an open laceration on the back of Employee's neck, EMT also checked for a pulse. Employee was un-

conscious, had no pulse, and was not breathing. EMT started CPR and mouth-to-mouth resuscitation; however, Employee's status did not change. When personnel from the fire engine company and ambulance arrived, within five to six minutes after EMT, they took over CPR. EMT never did identify if Employee had an open laceration on the back of his head or neck, because EMT "was more interested in trying to give [Employee] the life saving breaths and compressions" to "maybe bring [Employee] back."

EMT did notice there was a hammer close to Employee and also a ladder approximately four feet from Employee. According to Employee's supervisor, Lloyd Jones, Employee was in the mess hall to replace some Formica on the beverage bar, specifically the front edge. Based on the condition of the area Employee was found and the rolls of Formica Employee was to use, Jones determined that Employee had not even started the job. The job Employee was supposed to accomplish in the mess hall did not require a ladder. Jones was not aware that Employee had any health problems prior to his death and Jones never noticed that Employee had a limp, shortness of breath, or anything else that raised suspicion.

At the hospital, Dr. Mark Jackson ordered an enzyme blood test, specifically of the enzymes CK, CK–MB, and CK–MB %. The lab report indicated that the enzyme levels were elevated, and under the heading of "interpretations," the report notes that such elevated levels were consistent with a myocardial infarction. Employee's family members declined an autopsy and the death certificate, dated January 21, 1997, lists the immediate cause of death as cardiac arrest, with possible sudden cardiac death and possible acute MI as underlying causes.

Dr. Allen Parmet, a physician specializing in occupational and aerospace medicine, provided medical testimony on Employee's behalf. Dr. Parmet reviewed the available records and rendered an opinion that Employee's death was a "sudden death" and that "[t]he exact etiology of [Employee's] death cannot be determined from the facts available." Dr. Parmet noted that Employee had significant risk for coronary artery disease, had a long history of an irregular heart rate, and had been requested to seek a cardiac evaluation.

According to Dr. Parmet, there was conflicting information regarding Employee's condition prior to his death, as Wife described that he was experiencing some sort of chest pain that morning, EMT saw no health problems, yet some mess hall workers, who saw him that morning but did not witness the incident, indicated that Employee was uncharacteristically withdrawn. In Dr. Parmet's opinion, none of that led "to an absolute conclusion of coronary artery disease[,] myocardial infarction or cardiac arrest."

Dr. Parmet stated that a stroke or a slip-and-fall injury were other possible causes of death. Dr. Parmet did note that it was unusual for a patient to experience a complete loss of consciousness with a stroke. A slip and fall with head trauma could result in death as well. According to Dr. Parmet, given the information available, no further conclusion or determination could be made, other than that Employee's death occurred on the job.

Dr. Stephen Schuman testified on behalf of the employer, Harbert Yeargin, and the insurer, Liberty Mutual Insurance Company. Dr. Schuman, a physician specializing in internal medicine and cardiology, also reviewed the available records. According to Dr. Schuman, emergency room records showed that Employee was in cardiac arrest and "blood gasses revealed severe

hypoxia [low oxygen content]." Levels of blood enzymes, CK, CK–MBs, and also LDH, proteins in the heart muscle that are liberated from the heart during a heart attack, were elevated showing this detachment from the heart into the blood stream had occurred.

In Dr. Schuman's opinion, Employee's previous medical records showed he had cardiac problems prior to his death. He noted the heart rate of 36 indicated by Dr. Trecha in August of 1994, was "a pathologically slow heart rate [that] .... could mean conduction system disease of the heart where the sinus node or electrical firing mechanism of the heart is not working properly." Without the further cardiac evaluation that was strongly suggested by Dr. Trecha, Dr. Schuman stated that it was difficult to make a diagnosis, but that it was definitely abnormal.

Dr. Schuman concluded that there was no doubt Employee suffered a cardiac arrest of which the most common cause "is ischemic heart disease or acute MI." Further, Dr. Schuman opined that Employee had an acute MI, not just "possible acute MI" as shown on the death certificate, based on the elevation of the cardiac enzymes. According to Dr. Schuman, when Employee reached the emergency room, "he was in the midst of a heart attack that had begun at least four to six hours ... prior to his arrival in the emergency room." Thus, in Dr. Schuman's opinion, Employee "died because of his underlying heart disease." As for a possible head injury, Dr. Schuman noted that, even without an autopsy, head trauma would not cause the elevation in enzymes.

Following a hearing on the matter before the Division of Workers' Compensation, the ALJ issued an award denying benefits for Employee. The ALJ found that the "accident or occupational disease [did not] arise out of or in the course of the employment[.]" Rather, Employee died "as a result of a heart attack and cardiac arrest." Given the findings regarding Employee's death, the ALJ determined that the "found dead" presumption was not applicable and that Employee's death was not compensable "unless the evidence supports a finding that [Employee's] work was a substantial factor in causing [Employee's] heart attack." The ALJ determined there was not sufficient evidence to support such a finding. Therefore, according to the ALJ, the claim for benefits must be denied.

The matter was appealed to the Commission, which affirmed the award and decision of the ALJ, finding that the award and decision were supported by competent and substantial evidence. The Commission incorporated the ALJ's award and decision by reference. This appeal followed.

■ Wife raises one point, arguing that the Commission erred in ruling that Employee did not sustain an accident arising out of or in the course of employment because he was found dead on the job. According to Wife, given the circumstances of the case that Employee was found dead on the job performing his duties and the cause of death cannot be determined, the "found dead" presumption applies and evidence was not presented to rebut the presumption.

Wife notes that the definition of "accident" was changed in 1993 and that no appellate court since that time has discussed whether the "found dead" presumption is still valid. Section 287.020 contains the definition; the words in italics were added in 1993.

The word "accident" as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or un-

foreseen *identifiable* event *or series of events* happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury. *An injury is compensable if it is clearly work related. An injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability. An injury is not compensable merely because work was a triggering or precipitating factor.* § 287.020.2, RSMo 2000.

■ In *Carter v. Jones Truck Lines, Inc.*, 943 S.W.2d 821 (Mo.App.1997), this Court discussed how the "judicial construction of the statutory definition of 'accident' had been broadened[.]" *Id.* at 824. The case indicated that a *work related* heart attack that occurs during the course of one's employment is compensable. *Id.* (emphasis added). However, we reversed the decision of the Commission, concluding that there was not substantial evidence to support a finding that the actual triggering cause of the heart attack was work or job related; thus, an essential element of the claim was not met. *Id.* at 829. The accident must be unique to the work, and work must be more than a triggering or precipitating factor, rather it must be a substantial factor in causing the injury or death. *Gausling v. United Industries*, 998 S.W.2d 133, 136 (Mo.App.1999), *overruled in part on other grounds by Hampton*, 121 S.W.3d at 227.

■ In *Bear v. Anson Implement, Inc.*, 976 S.W.2d 553 (Mo.App.1998), the appellate court noted that in determining whether an injury is compensable, it is not sufficient that the claimant's employment furnished the occasion or place for the injury. *Id.* at 556–57. Further, an idiopathic injury or condition, such as a heart attack, that precipitates an accident is not compensable if that heart attack or other idiopathic injury or condition is not triggered by conditions of employment. *Knipp v. Nordyne, Inc.*, 969 S.W.2d 236, 239 (Mo.App.1998), *overruled in part on other grounds by Hampton*, 121 S.W.3d at 227. Thus, for example, even though a heart attack itself may not be compensable, injuries sustained in a fall as a result of the heart attack would be compensable as long as there is a causal connection between the fall and the workplace, i.e., falling from a ladder being used in the course of employment. *Id.* at 239–40.

■ Wife is correct that Missouri cases address the "found dead" presumption. However, the respondents are correct that none of those cases have permitted recovery based on an application of the presumption. In *Parrish v. Kansas City Sec. Serv.*, 682 S.W.2d 20 (Mo.App.1984), although decided prior to the changes in the definitional section of the Missouri Workers' Compensation Act, the Western District of this Court noted that for a injury or death to be held compensable there must be a causal connection between the employment and the accident and the injury or death. *Id.* at 24. The presumption does not extend to a showing of an accident. *Id.* To permit recovery under the "found dead" presumption, "the element of accident must plainly appear or be readily inferable from the surrounding circumstances." *Id.*

■ The presumption may be applicable if, in the absence of contrary evidence, an employee is found injured or dead as a result of unexplained circumstances. *Id.* at 27. However, the presumption is inapplicable if the critical elements of "arising out of" or "in the course of" employment are lacking. *Id.*

In *Russell v. Southwest Grease & Oil Co.*, 509 S.W.2d 776, (Mo.App.1974), *overruled in part on other grounds by Hamp-*

*ton*, 121 S.W.3d at 227, it was noted that "[t]here is sound logic in presuming that an unexplained injury or death which occurs on the premises and during the time of employment has a causal connection with the employment activities." 509 S.W.2d at 779. However, "[t]hat is far different ... from taking the further step of inferring that such an unexplained injury or death occurred by reason of accident rather from a natural cause." *Id.*

Although "accident" may have been broadened since these cases were decided, we find their reasoning still relevant to a determination of whether the "found dead" presumption is applicable to any particular set of circumstances. We agree with the Commission that the presumption was not applicable here because the evidence did not support a finding that Employee's work was a substantial factor, or even a precipitating or triggering factor, in causing Employee's heart attack.

There was sufficient competent and substantial evidence to support the Commission's decision, and that decision is affirmed.

GARRISON, P.J., and RAHMEYER, J., concur.